[No. 47543-1.　En Banc.　February 18, 1982.]

THE STATE OF WASHINGTON, *Appellant,* v. ALLEN WHITE, *Respondent.*

*Curtis M. Janhunen, Prosecuting Attorney,* and *Stephen L. Olson, Deputy,* for appellant.

*Farra & Godfrey,* by *John L. Farra,* for respondent.

WILLIAMS, J.—A transient, Allen White, was arrested by a Grays Harbor County deputy sheriff for violating RCW 9A.76.020(1) and (2), which make it a misdemeanor to "obstruct a public servant" by failing, "without lawful excuse", to provide true information "lawfully required" of an individual by a "public servant". After his arrest, White was held overnight in jail and subsequently confessed to burglarizing a garage and stealing food and other items which he was carrying at the time of his arrest. The trial court declared sections 1 and 2 of RCW 9A.76.020 unconstitutionally vague, invalidated White's arrest, and granted White's motion to suppress the goods seized by the police and his confession given after arrest. The Court of Appeals, Division Two, certified the case to this court. We affirm.

The facts are as follows:

A deputy sheriff responded to a call from a resident that a suspicious, greasy–haired person was hanging around a neighborhood near the railroad tracks. When the deputy arrived, he saw Allen White carrying a large plastic garbage bag containing such items as kerosene, charcoal, magazines, and a skillet. The deputy noticed that the door of a nearby shed was hanging loose on its hinge. Mr. White was stopped by the officer and asked his name. He answered truthfully. He was then asked for identification, which he denied having. When asked where he lived, White answered evasively and pointed down the road toward some houses, but could not specify a particular house. The deputy then noticed a bulge in White's back pocket that appeared to be a wallet. The deputy testified that Mr. White then produced a British Columbia driver's license in the name of Allen White and stated, "I lied to you, I don't live anywhere." White was placed under arrest for violating RCW 9A.76.020(1) and (2). The next day, after spending a night in jail, he confessed to burglarizing the shed and taking the items seized by the officer.

RCW 9A.76.020 provides as follows:

Obstructing a public servant. Every person who, (1) without lawful excuse shall refuse or knowingly fail to

make or furnish any statement, report, or information lawfully required of him by a public servant, or (2) in any such statement or report shall make any knowingly untrue statement to a public servant, or (3) shall knowingly hinder, delay, or obstruct any public servant in the discharge of his official powers or duties; shall be guilty of a misdemeanor.

At issue in this case are the first two sections regarding failure "without lawful excuse" to provide true information "lawfully required" of an individual by a "public servant". A provision in RCW 9.69.060 similar to section 3 of RCW 9A.76.020 was previously upheld as it applies to conduct rather than speech. *State v. Grant*, 89 Wn.2d 678, 685–86, 575 P.2d 210 (1978). Although our holding in this case need not reach the issue, we presume the discussion in *Grant* upholding the provision regarding obstruction of an officer by conduct is similarly applicable to RCW 9A.76.020(3).

 I. *Whether RCW 9A.76.020(1) and (2) are unconstitutionally vague.*

The first issue we must resolve is whether criminal sanctions may be imposed upon an individual for failing to disclose correct information to a police officer. Independent of the "stop–and–identify" statute, RCW 9A.76.020, no grounds existed to justify respondent's arrest. There was no probable cause to believe respondent had committed a burglary or any crime other than that defined by the statute in question. It must be noted that although respondent was originally detained for obstructing a public servant, he was never formally charged under the statute. The effect of respondent's arrest for obstructing a public servant was to permit the officer to detain him long enough to investigate and gather evidence against him for burglary.

The touchstone of Fourth Amendment protections against unreasonable police searches and seizures is the requirement that such invasions be based on "probable cause". *Dunaway v. New York*, 442 U.S. 200, 208, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979). Those cases authorizing

"seizures" of persons on lesser cause are narrowly drawn and carefully circumscribed. *See Adams v. Williams,* 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972); *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *State v. Gluck,* 83 Wn.2d 424, 518 P.2d 703 (1974).

Stop–and–identify statutes are recognized by some commentators as valuable tools to police in preventing and detecting crime and in giving additional authority to officers in sometimes dangerous street encounters. *See* Note, *"Your Papers, Please."—Is an Identification Requirement Constitutional?,* 37 Wash. & Lee L. Rev. 253 (1980). However, useful as they may be, statutes of this type can result in disturbing intrusions into an individual's right to privacy and can implicate other rights specifically enumerated in the Bill of Rights.[1] For this reason, statutes in the nature of stop–and–identify statutes must be carefully and restrictively drawn.

In *Bellevue v. Miller,* 85 Wn.2d 539, 536 P.2d 603 (1975), we reviewed the Bellevue "wandering and prowling" ordinance and held it void for vagueness.[2] The term "unlawful

---

[1]Four distinct constitutional challenges to stop–and–identify statutes are possible. First, the identification requirement may be violative of an individual's First Amendment right not to speak. This right has been recognized by the United States Supreme Court on several occasions. *See, e.g., Wooley v. Maynard,* 430 U.S. 705, 709, 51 L. Ed. 2d 752, 97 S. Ct. 1428 (1977); *West Virginia Bd. of Educ. v. Barnette,* 319 U.S. 624, 633, 87 L. Ed. 1628, 63 S. Ct. 1178, 147 A.L.R. 674 (1943). Second, the identification requirement may violate the Fifth Amendment privilege against self–incrimination. *See Albertson v. Subversive Activities Control Bd.,* 382 U.S. 70, 77, 15 L. Ed. 2d 165, 86 S. Ct. 194 (1965). Third, the statute can be attacked as unconstitutionally vague, in violation of the Fourteenth Amendment's due process clause. Fourth, such statutes may also be attacked as violative of the spirit of the Fourth Amendment's prohibition against unreasonable searches and seizures. The latter two challenges are directly addressed by our opinion in this case.

[2]For a discussion of the void–for–vagueness doctrine as it affects fundamental rights, *see, e.g.,* Amsterdam, *Federal Constitutional Restrictions on the Punishment of Crimes of Status, Crimes of General Obnoxiousness, Crimes of Displeasing Police Officers, and the Like,* 3 Crim. L. Bull. 205 (1967); Douglas, *Vagrancy and Arrest on Suspicion,* 70 Yale L.J. 1 (1960); Sherry, *Vagrants, Rogues and Vagabonds—Old Concepts in Need of Revision,* 48 Cal. L. Rev. 557 (1960); Note, *Recent Supreme Court Developments of the Vagueness Doctrine: Four Cases*

purpose" was contained in that ordinance and we noted:

> Legislation which purports to define illegality by resort to such inherently subjective terms as "unlawful purpose" . . . permits, indeed requires, an *ad hoc* police determination of criminality. . . . The potential for arbitrary and discriminatory law enforcement under such legislation cannot constitutionally be tolerated.

*Bellevue v. Miller, supra* at 545. We went on to discuss the Fourth Amendment and other constitutional problems inherent in that ordinance, and the concerns expressed there are equally applicable to the legislation before us:

> Such a basis for arrest, predicated upon nothing more than an officer's suspicion that a person has been involved in unlawful activity or prediction that the person will become involved in unlawful activity, contravenes the traditional reluctance in our jurisprudence to punish individuals for anticipated but as yet uncommitted, or suspected but unknown crimes. . . . Arrest must be grounded upon a more substantial basis than police hunch. . . .
>
> Furthermore, if it is not the purpose then it is surely an important effect of legislation such as the Bellevue ordinance that the constitutional safeguard of requiring probable cause to arrest is circumvented. To sustain this ordinance
>
>> would be to allow a crime to be defined so as to render the requirement of probable cause to effect a valid arrest an illusory protection. . . . To say that an officer may arrest if he has probable cause to believe that the suspect's conduct is suspicious is to speak in anomalies.

(Citations omitted.) *Bellevue v. Miller, supra* at 546. The *Bellevue* ruling was grounded in the Fourteenth Amendment's due process clause, as is our ruling in the instant case.

■ A statute is void for vagueness under the Fourteenth Amendment if it is framed in terms so vague that persons

---

of common intelligence must necessarily guess at its meaning and differ as to its application. *Papachristou v. Jacksonville,* 405 U.S. 156, 31 L. Ed. 2d 110, 92 S. Ct. 839 (1972); *Coates v. Cincinnati,* 402 U.S. 611, 29 L. Ed. 2d 214, 91 S. Ct. 1686 (1971); *Winters v. New York,* 333 U.S. 507, 92 L. Ed. 840, 68 S. Ct. 665 (1948); *Bellevue v. Miller, supra; Seattle v. Drew,* 70 Wn.2d 405, 423 P.2d 522, 25 A.L.R.3d 827 (1967). It is fundamental that no law may unnecessarily interfere with a person's freedom, whether it be to move about or to stand still. The right to be let alone is inviolate; interference with that right is to be tolerated only if it is necessary to protect the rights and welfare of others. *See Papachristou v. Jacksonville, supra.*

■ The statute involved here is defective both in the sense that it fails to give fair notice of what activities are required or forbidden and because it encourages arbitrary and erratic stops and arrests. Even if we assume that it is applied in good faith that police officers in general enforce laws with self-restraint and prosecutors apply the law fairly, the statute must fall. "Well-intentioned prosecutors . . . do not neutralize the vice of a vague law." *Baggett v. Bullitt,* 377 U.S. 360, 373, 12 L. Ed. 2d 377, 84 S. Ct. 1316 (1964).

The problems with the statute before us are obvious. For example, when must a citizen answer inquiries, and when does he have "lawful excuse" not to answer? What is "lawfully required" in the way of reports or information? May any "public servant", as defined in RCW 9A.04.110(22), demand information or only those charged with investigating or enforcing laws and regulations? May any citizen be stopped at any time—or only when there is suspicious conduct, or in high crime areas, or only in the course of investigating a suspected or known crime? The possible applications and interpretations are nearly endless.[3]

---

[3]For a more detailed and comprehensive discussion of the constitutional deficiencies and problems faced by criminal defendants under stop-and-identify statutes like the one before us, see Judge Horowitz' opinion in *Mountlake Terrace*

The determination of what information is "lawfully required" under this statute is a subjective one, left to the unfettered discretion of not only police officers, but virtually any public servant. Likewise, the term "lawful excuse" is nowhere defined in RCW Title 9A, and a citizen who is being questioned must necessarily guess as to whether his claim of privilege not to answer under the Fifth Amendment or pursuant to any other case or statutory exemption will be a "lawful excuse". The requirement of RCW 9A.76-.020(1) to furnish "any statement, report, or information" is broad and undefined. Beyond these difficulties, the RCW Title 9A definition of "public servant" is entirely too broad and encompasses nearly any person who is employed by the government:

> "Public servant" means any person other than a witness who presently occupies the position of or has been elected, appointed, or designated to become any officer or employee of government, including a legislator, . . . juror, and any person participating as an advisor, consultant, or otherwise in performing a governmental function;

RCW 9A.04.110(22).

In *People v. DeFillippo,* 80 Mich. App. 197, 262 N.W.2d 921 (1977), the Michigan Court of Appeals held that Detroit's stop–and–identify ordinance was unconstitutionally vague.[4] The language of that ordinance was more restrictively drawn than RCW 9A.76.020 in that the Detroit ordinance required "reasonable cause" to believe that the person to be investigated was involved in some criminal activity. Yet, that ordinance was nevertheless declared

---

*v. Stone,* 6 Wn. App. 161, 166–69, 492 P.2d 226 (1971).

[4] "As amended, Code of the City of Detroit § 39–1–52.3 provided:
"'When a police officer has reasonable cause to believe that the behavior of an individual warrants further investigation for criminal activity, the officer may stop and question such person. It shall be unlawful for any person stopped pursuant to this section to refuse to identify himself, and to produce verifiable documents or other evidence of such identification. In the event that such person is unable to provide reasonable evidence of his true identity, the police officer may transport him to the nearest precinct in order to ascertain his identity.'" *Michigan v. DeFillippo,* 443 U.S. 31, 33 n.1, 61 L. Ed. 2d 343, 99 S. Ct. 2627 (1979).

unconstitutional and the holding was impliedly approved by the United States Supreme Court in *Michigan v. DeFillippo,* 443 U.S. 31, 61 L. Ed. 2d 343, 99 S. Ct. 2627 (1979).

In *Brown v. Texas,* 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979), the Supreme Court considered a stop–and–identify statute and indicated that stops under such statutes must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers. The statute before us fails to require specific, objective facts or neutral limitations so as to justify the initial stop. In *Delaware v. Prouse,* 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979), the Court stated that the discretion of the officer in the field must be circumscribed to prevent standardless and unconstrained discretion. Since the vague language of RCW 9A.76.020(1) and (2) offers no such protection against unwarranted arbitrary intrusions, the statute fails to pass constitutional muster under the Fourteenth Amendment.

We recognize an obligation to construe legislation so as to uphold its constitutionality whenever possible. *Bellevue v. Miller, supra.* The standardless sweep of this statute, however, cannot be sufficiently narrowed by any limiting construction we might place upon it. We conclude, therefore, that RCW 9A.76.020 is invalid as to sections 1 and 2.

II. *Whether the defendant's burglary confession should be suppressed.*

After declaring RCW 9A.76.020(1) and (2) unconstitutionally vague and the arrest pursuant thereto invalid, the trial court suppressed the respondent's burglary confession, presumably under the "fruit of the poisonous tree" doctrine first stated in *Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). Under the rule of *Wong Sun,* all evidence which is the product of an illegal search or seizure is suppressed.

We are aware of the recent United States Supreme Court decision in *DeFillippo,* which appears to directly control the case before us. In that case, the defendant was arrested under Detroit's stop–and–identify ordinance. In a search incident to the arrest, drugs were found. The defendant was charged with possession of those drugs, not with a violation of the stop–and–identify statute. The Supreme Court stressed that the Detroit ordinance in question had never before been challenged and was therefore "presumptively valid". Since the ordinance had never been previously questioned, the court deemed it too heavy a burden for the police to anticipate the unconstitutionality of the legislation. The court held that the purposes of the exclusionary rule would not have been served by suppressing evidence gained as the result of the police officers' good faith arrests under a presumptively valid statute. *Michigan v. DeFillippo, supra* at 34–40. For each of the following reasons, we find the holding of *DeFillippo* to be inapplicable to this case.

A. Respondent's arrest was partially based on a flagrantly unconstitutional statute.

Respondent was arrested for violating sections 1 *and* 2 of RCW 9A.76.020. In *Mountlake Terrace v. Stone,* 6 Wn. App. 161, 492 P.2d 226 (1971), the Court of Appeals considered the constitutionality of Mountlake Terrace Ordinance 405, a provision almost identical to the present version of RCW 9A.76.020. The court held the first portion of the ordinance, relating to refusal to answer the questions of a public officer, was unconstitutionally vague and violated the Fourteenth Amendment due process clause.

The *Mountlake Terrace* holding was impliedly adopted in *State v. Grant,* 89 Wn.2d 678, 575 P.2d 210 (1978), where the court presumed that the first portion of RCW 9.69.060, worded in language identical to the Mountlake Terrace ordinance, was likewise invalid. Both of those provisions were substantially the same as section 1 of RCW

9A.76.020 at issue here.[5] The reasons articulated in *Mountlake Terrace* for holding that provision unconstitutionally vague are equally applicable to RCW 9A.76.020(1). Accordingly, we feel that section 1 of RCW 9A.76.020 is flagrantly unconstitutional and within the exception shaped by the court in *DeFillippo* in its statement:

> The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—*with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws.*

(Italics ours.) *DeFillippo*, at 38. Where substantially the same language in a different statute has been adjudicated unconstitutional by a court of this state, a statute that has not been previously construed may nevertheless be "so grossly and flagrantly unconstitutional" by virtue of a prior dispositive judicial holding that it may not serve as the basis of a valid arrest. Here, a person of reasonable prudence would be bound to see the flaws of RCW 9A.76-.020(1).

The exact language of the statute in question need not be invalidated on a case–by–case basis. If such an approach were required, legislative bodies would be encouraged to pass other such constitutionally infirm measures, knowing that the police would get "one free bite" at the expense of

---

[5]RCW 9.69.060 reads as follows:

"*Obstructing public officer. Every person who, after due notice, shall refuse or neglect to make or furnish any statement, report or information lawfully required of him by any public officer*, or who, in such statement, report or information shall make any wilfully untrue, misleading or exaggerated statement, or who shall wilfully hinder, delay or obstruct any public officer in the discharge of his official powers or duties, shall be guilty of a misdemeanor." (Italicized to the extent invalidated.) *See also Mountlake Terrace v. Stone*, 6 Wn. App. 161, 162, 492 P.2d 226 (1971).

RCW 9A.76.020 reads as follows:

"*Obstructing a public servant.* Every person who, (1) without lawful excuse shall refuse or knowingly fail to make or furnish any statement, report, or information lawfully required of him by a public servant, or (2) in any such statement or report shall make any knowingly untrue statement to a public servant, or (3) shall knowingly hinder, delay, or obstruct any public servant in the discharge of his official powers or duties; shall be guilty of a misdemeanor."

an individual's constitutionally protected rights. This type of "legislative legerdemain [is] not to be countenanced." *See DeFillippo,* at 45 (Brennan, J., dissenting).

It is true that White's arrest was partially based on section 2 of RCW 9A.76.020. Since this section has not previously been construed, it is presumptively valid under *DeFillippo.* Furthermore, although analogous provisions existed in the laws at issue in *Mountlake Terrace* and *Grant,* those provisions were *not* at issue in those cases, and consistent with *DeFillippo,* the courts in those cases assumed the validity of those analogous provisions.

While RCW 9A.76.020(2) is presumptively valid, it cannot be enforced without incorporation of portions of the flagrantly unconstitutional section 1 of that statute. The import of our holding above that section 1 is flagrantly unconstitutional in its vagueness is that, based on the holding of *Mountlake Terrace* and dicta in *Grant,* a public servant may not be permitted to "lawfully require" statements of citizens under RCW 9A.76.020(1). A reasonable person would recognize the infirmities of that provision and would be foreclosed from requiring any statements pursuant to that provision.

Since a public servant may not require such statements through the provisions of RCW 9A.76.020(1), we need not reach the question of the validity of an arrest for the untruthfulness of such required statements. To the extent we must deter police officers from asking questions under RCW 9A.76.020(1), an arrest under the "presumptively valid" section 2 that itself requires such a question to be asked, cannot establish a valid arrest even under *DeFillippo.* We therefore hold the evidence of respondent's burglary inadmissible.

B. All searches and seizures must be "reasonable" under the Fourth Amendment.

■ The proper analysis for determining whether evidence should be excluded under the Fourth Amendment is to test the reasonableness of the officer's conduct under the

circumstances.

When police officers have a "well–founded suspicion not amounting to probable cause" to arrest, they may nonetheless stop a suspected person, identify themselves, and ask that person for identification and an explanation of his or her activities. *State v. Gluck,* 83 Wn.2d 424, 426, 518 P.2d 703 (1974); *Brown v. Texas,* 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio,* 392 U.S. 1, 16, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Thus, whenever an officer detains an individual to inquire his name and purpose, there is a "seizure" for Fourth Amendment purposes. *Brown v. Texas, supra; Terry v. Ohio, supra.* The reasonableness of such seizure depends "'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977), quoting from *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975). The issue is not whether a police officer acted in good faith reliance on a statute. Instead, the inquiry should be framed as follows:

> The question in this Court upon review of a state–approved search or seizure "is not whether the search [or seizure] was authorized by state law. *The question is rather whether the search [or seizure] was reasonable under the Fourth Amendment.*

(Italics ours.) *Sibron v. New York,* 392 U.S. 40, 61, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968), quoting from *Cooper v. California,* 386 U.S. 58, 61, 17 L. Ed. 2d 730, 87 S. Ct. 788 (1967).

The warrantless conduct of the officer in this case must be tested for reasonableness. First, to justify the initial stop the officer must be able to point to specific and articulable facts that give rise to a reasonable suspicion that there is criminal activity afoot. *See Terry v. Ohio, supra.* It appears that the officer did have reasonable sus-

picion to stop the respondent based upon the suspicious nature of his actions near the railroad tracks, a citizen's report of a suspicious person's presence nearby, and the shed door which was seen hanging loose on its hinge. Second, the detention must be as limited in time as possible, but can be long enough to make a reasonable inquiry and investigation. The length of the detention must be tested according to the reasonableness under the circumstances taking into consideration the seriousness of the offense suspected, the consequences of delay on the part of officers, the likelihood of the detainee's involvement in the offense, and the extent of the intrusion. *See, e.g., United States v. Garcia,* 450 F. Supp. 1020 (E.D.N.Y. 1978); *United States v. Price,* 599 F.2d 494 (2d Cir. 1979); 3 W. LaFave, *Search and Seizure* § 9.2 (1978 & Supp. 1981). In the case before us, the detention was clearly too long to be reasonable. The respondent was detained overnight in jail where he subsequently confessed to burglary. The length of that detention was entirely too long to accomplish the purpose of determining the identity, residence, and purpose of the respondent. Third, a detainee's refusal to disclose his name, address, and other information cannot be the basis of an arrest. Although a person may be briefly detained on the basis of reasonable suspicion "while pertinent questions are directed to him . . . the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest . . ." *Terry v. Ohio, supra* at 34 (White, J., concurring). The arrest in the present case was partially based on just that justification condemned in *Terry.*

We believe the stop–and–identify statute in question to be an unwarranted extension of the *Terry* stop. It makes criminal exactly what *Terry* is intended to protect—the right to refuse to answer. Statutes such as RCW 9A.76-.020 purport to create a substantive offense, but have the effect of negating the probable cause requirement basic to the Fourth Amendment. If we were to permit the use of evidence obtained incident to an arrest under this statute,

we would allow the Legislature to make an "end run" around the Fourth Amendment. *See generally Constitutional Law: Search and Seizure—The Role of Police Officer Good Faith in Substantive Fourth Amendment Doctrine—Michigan v. DeFillippo, 443 U.S. 31 (1979),* 55 Wash. L. Rev. 849, 861–67 (1980). This we cannot permit. Neither can we allow the officer's claim of good faith to supplant independent judicial scrutiny of police conduct.

 The good faith arrest exception is unworkable and is contrary to well established Fourth Amendment principles.[6] As pointed out by Judge Browning:

> The public interest may dictate that the police not be deterred from enforcing statutory law even when it mandates unconstitutional conduct, *but the public interest is served by deterring legislators from enacting such statutes.*

(Italics ours.) *Powell v. Stone,* 507 F.2d 93, 98 (9th Cir. 1974), *rev'd on other grounds,* 428 U.S. 465, 49 L. Ed. 2d 1067, 96 S. Ct. 3037 (1976). The potential abuses envisioned by Judge Browning are evident in this case. In 1971, Mountlake Terrace Ordinance 405 was invalidated for being unconstitutionally vague. *Mountlake Terrace v. Stone,* 6 Wn. App. 161, 492 P.2d 226 (1971). The language of that ordinance was identical to RCW 9.69.060, which had been in existence since 1909. The Legislature responded in

---

[6]The officer's "good faith" in *Michigan v. DeFillippo, supra,* required a showing only that he enforced a presumptively valid statute in the good faith belief it was valid. The incorporation of a subjective good faith test is unworkable in situations not directly addressed by Chief Justice Burger's opinion. For example, what if, as here, a similar statute was invalidated 10 years previously? How about 1 month before the arrest? What if fellow officers know of contrary case law, but the arresting officer does not? How do courts probe the minds of officers to see if their beliefs of validity are truly held? Can a criminal defendant ever successfully refute the officer's assertions of good faith? *See* Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn. L. Rev. 349, 436–37 (1974). The good faith standard imposes yet another factual burden on the courts in the already complex Fourth Amendment area. *See United States v. Peltier,* 422 U.S. 531, 560–61, 45 L. Ed. 2d 374, 95 S. Ct. 2313 (1975) (Brennan, J., dissenting). We believe the objective probable cause standard is the only workable test in cases such as the one before us.

1975 by repealing RCW 9.69.060, Laws of 1975, 1st Ex. Sess., ch. 260, p. 820, and enacting an almost identical provision, RCW 9A.76.020, Laws of 1975, 1st Ex. Sess., ch. 260, p. 853. RCW 9.69.060 was eventually invalidated in 1978 in *State v. Grant,* 89 Wn.2d 678, 575 P.2d 210 (1978), but by that time the new provision accomplished the same purpose. The need for deterrence of such legislative conduct in the future is as essential as deterring unlawful police action. Firmly applying the exclusionary rule to prevent the use of evidence obtained pursuant to such statutes works to that end.

 C. Const. art. 1, § 7 provides broader protections than the Fourth Amendment.[7]

 As we have stated in previous decisions, this court may interpret the Washington Constitution as more protective of individual rights than parallel provisions of the United States Constitution. *See State v. Simpson,* 95 Wn.2d 170, 177–82, 622 P.2d 1199 (1980); *State v. Fain,* 94 Wn.2d 387, 392–93, 617 P.2d 720 (1980); *Federated Publications, Inc. v. Kurtz,* 94 Wn.2d 51, 615 P.2d 440 (1980); *Northend Cinema, Inc. v. Seattle,* 90 Wn.2d 709, 714, 585 P.2d 1153, 1 A.L.R.4th 1284 (1978); *State v. Hehman,* 90 Wn.2d 45, 49, 578 P.2d 527 (1978); *Darrin v. Gould,* 85 Wn.2d 859, 868, 540 P.2d 882 (1975); *State v. Michaels,* 60 Wn.2d 638, 646–47, 374 P.2d 989 (1962). *See generally* Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv. L. Rev. 489 (1977).

 We have had two recent occasions to interpret Const. art. 1, § 7 more expansively than the Fourth Amendment so as to provide additional protection to citizens of this state. In *State v. Simpson, supra,* a plurality of this court found that Const. art. 1, § 7 conferred the right of "automatic standing" to contest illegal searches and seizures. This

---

[7]Const. art. 1, § 7 provides:

"No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

interpretation gave greater protections than those found by the United States Supreme Court in *United States v. Salvucci,* 448 U.S. 83, 65 L. Ed. 2d 619, 100 S. Ct. 2547 (1980). In *State v. Hehman, supra,* this court found the Washington Constitution to grant greater protections than the Fourth Amendment in the area of custodial arrests for minor traffic violations. *Cf. United States. v. Robinson,* 414 U.S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467 (1973); *Gustafson v. Florida,* 414 U.S. 260, 38 L. Ed. 2d 456, 94 S. Ct. 488 (1973). In so holding, Chief Justice Wright noted:

> While *United States v. Robinson* . . . and *Gustafson v. Florida* . . . do not require the result reached herein, they do not in any way prevent our reaching this result. Decisions of the United States Supreme Court establish the minimum rights which may be accorded a defendant and yet comply with the guaranties of the United States Constitution. Such decisions, however, do not limit the right of state courts to accord to defendants greater rights.

(Citations omitted.) *State v. Hehman, supra* at 49.

 The result reached by the United States Supreme Court in *DeFillippo* is justifiable only if one accepts the basic premise that the exclusionary rule is merely a remedial measure for Fourth Amendment violations. As a remedial measure, evidence is excluded only when the purposes of the exclusionary rule can be served.[8] This approach permits the exclusionary remedy to be completely severed from the right to be free from unreasonable governmental

---

[8]In *Michigan v. DeFillippo,* 443 U.S. 31, 38 n.3, 61 L. Ed. 2d 343, 99 S. Ct. 2627 (1979), Chief Justice Burger noted that "[t]he purpose of the exclusionary rule is to deter unlawful police action." *Accord, United States v. Janis,* 428 U.S. 433, 445–47, 49 L. Ed. 2d 1046, 96 S. Ct. 3021 (1976); *United States v. Calandra,* 414 U.S. 338, 347–48, 38 L. Ed. 2d 561, 94 S. Ct. 613 (1974).

No mention is made of another frequently stated rationale for the rule—the preservation of judicial integrity. This rationale was first articulated by Justice Brandeis in his dissenting opinion in *Olmstead v. United States,* 277 U.S. 438, 483–85, 72 L. Ed. 944, 48 S. Ct. 564, 66 A.L.R. 376 (1928). Justice Brandeis argued that when the government is permitted to use illegally obtained evidence in courts of law, the integrity of the judiciary itself is tarnished. *See also Stone v. Powell,* 428 U.S. 465, 485, 49 L. Ed. 2d 1067, 96 S. Ct. 3037 (1976), where judicial integrity is mentioned as a secondary rationale.

intrusions. Const. art. 1, § 7 differs from this interpretation of the Fourth Amendment in that it clearly recognizes an individual's right to privacy with no express limitations.

Historical evidence reveals that the framers of the Washington Constitution intended Const. art. 1, § 7 to have a meaning different from the federal provision. The Constitutional Convention of 1889 was presented with a proposed state provision with language identical to the Fourth Amendment. This proposal was rejected in favor of our current version of Const. art. 1, § 7. *See Journal of the Washington State Constitutional Convention: 1889,* at 497 (B. Rosenow ed. 1962). We think the language of our state constitutional provision constitutes a mandate that the right of privacy shall not be diminished by the judicial gloss of a selectively applied exclusionary remedy. In other words, the emphasis is on protecting personal rights rather than on curbing governmental actions. This view toward protecting individual rights as a paramount concern is reflected in a line of Washington Supreme Court cases pre-dating *Mapp v. Ohio,* 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A.L.R.2d 933 (1961), which first made the exclusionary rule applicable to the states. *See State v. Cyr,* 40 Wn.2d 840, 842, 246 P.2d 480 (1952); *State v. Miles,* 29 Wn.2d 921, 926, 190 P.2d 740 (1948); *State v. Gunkel,* 188 Wash. 528, 534–35, 63 P.2d 376 (1936); *State v. Buckley,* 145 Wash. 87, 258 P. 1030 (1927); *State v. Gibbons,* 118 Wash. 171, 182–88, 203 P. 390 (1922). The important place of the right to privacy in Const. art. 1, § 7 seems to us to require that whenever the right is unreasonably violated, the remedy must follow.[9]

This reading is certainly not a novel one. In fact, the

[9]We specifically note that this application of the exclusionary rule under Const. art. 1, § 7 will have no effect on our previous cases regarding "standing". Before a defendant has standing to challenge a search or seizure, he must adequately demonstrate that he has a reasonable expectation of privacy which society is prepared to recognize as legitimate. This establishes the "right to privacy" which may or may not give rise to the exclusionary remedy, depending on the reasonableness of the officer's conduct under the circumstances.

United States Supreme Court held the same view of the Fourth Amendment until recent decisions. In *Mapp,* the exclusionary rule was declared binding on the states as a component of the Fourteenth Amendment due process clause. Justice Clark delivered the majority opinion, in which he wrote:

> The right to privacy, when conceded operatively enforceable against the States, was not susceptible of destruction by avulsion of the sanction upon which its protection and enjoyment had always been deemed dependent under the *Boyd* [*v. United States,* 116 U.S. 616], *Weeks* [*v. United States,* 232 U.S. 383] and *Silverthorne* [*Lumber Co. v. United States,* 251 U.S. 385] cases. Therefore, in extending the substantive protections of due process to all constitutionally unreasonable searches—state or federal—it was logically and constitutionally necessary that *the exclusion doctrine—an essential part of the right to privacy—be also insisted upon as an essential ingredient of the right newly recognized by the Wolf* [*v. Colorado,* 338 U.S. 25] *case.* In short, the admission of the new constitutional right by *Wolf* could not consistently tolerate denial of its most important constitutional privilege, namely the exclusion of the evidence which an accused had been forced to give by reason of the unlawful seizure. *To hold otherwise is to grant the right but in reality to withhold its privilege and enjoyment.* Only last year the Court itself recognized that the purpose of the exclusionary rule "is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States,* [364 U.S. 206] at 217.

(Italics ours.) *Mapp,* at 655–56. The Court's current view of the exclusionary rule ignores the above language in *Mapp* without overruling it. *Mapp* stands as an anomaly in the court's current stance on the exclusionary rule. *Stone v. Powell,* 428 U.S. 465, 509, 49 L. Ed. 2d 1067, 96 S. Ct. 3037 (1976) (Brennan, J., dissenting). *See generally* Burkhoff, *The Court that Devoured the Fourth Amendment: The Triumph of an Inconsistent Exclusionary Doctrine,* 58 Or. L. Rev. 151 (1979).

Without an immediate application of the exclusionary

rule whenever an individual's right to privacy is unreasonably invaded, the protections of the Fourth Amendment and Const. art. 1, § 7 are seriously eroded. In our view, exclusion of the confession in this case is mandated by our state constitution. Such a rule will add stability to the rights of individual citizens, discourage the Legislature from passing provisions akin to RCW 9A.76.020, and will make law enforcement more predictable. As summarized by Justice Clark:

> [W]e can no longer permit it [the right to privacy] to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice.

*Mapp*, at 660.

The trial court's invalidation of RCW 9A.76.020(1) and (2) and its suppression of all evidence obtained as an incident to respondent's arrest under the above statute are affirmed.

ROSELLINI, STAFFORD, UTTER, and DORE, JJ., concur.

This dissenting opinion was prepared by Justice Floyd V. Hicks while a member of this court. It is adopted by the undersigned Justices.

We agree with the trial court and the majority that RCW 9A.76.020(1) and (2) are unconstitutionally vague. Since this is the first time such ruling has been made, however, the statute was on the books and valid. Therefore, the arrest and search made under it were valid and legal. On the authority of *Michigan v. DeFillippo*, 443 U.S. 31, 61 L. Ed. 2d 343, 99 S. Ct. 2627 (1979), we dissent from the majority's holding that the evidence of the burglary should be suppressed.

*DeFillippo* is directly in point. It is identical on its facts.

In fact, if anything, the Michigan statute is more intrusive in making it illegal for a person not to produce valid I.D., which RCW 9A.76.020 did not require.

Contrary to the assertion of the majority on page 102, the Supreme Court, in fact, did not "[stress] that the Detroit ordinance in question had never before been challenged . . ." The Court reasoned persuasively that:

> The remaining question, then, is whether, in these circumstances, it can be said that the officer lacked probable cause to believe that the conduct he observed and the words spoken constituted a violation of law simply because *he should have known the ordinance was invalid and would be judicially declared unconstitutional. The answer is clearly negative.*
>
> . . .
>
> . . . At that time, of course, there was *no controlling precedent that this ordinance was or was not constitutional,* and hence the conduct observed violated a presumptively valid ordinance. A prudent officer, in the course of determining whether respondent had committed an offense under all the circumstances shown by this record, *should not have been required to anticipate that a court would later hold the ordinance unconstitutional.*
>
> *Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality*—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. *Society would be ill–served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.*

(Italics ours.) *DeFillippo,* at 37–38.

The majority asserts that in this case the police should have been on notice that this statute would be declared unconstitutional, and thus should have done exactly as the last sentence above suggests they should not: take it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.

The majority relies on two cases, *State v. Grant,* 89

Wn.2d 678, 575 P.2d 210 (1978) and *Mountlake Terrace v. Stone,* 6 Wn. App. 161, 492 P.2d 226 (1971) for their position. Neither case declared RCW 9A.76.020 or its predecessor vague. In fact subsection 2, the specific section at issue here, was specifically upheld in *Grant.* The whole of the state statute was left untouched by *Mountlake Terrace,* which was directed only to a section of that city's ordinance. Language in the opinion is clear in excluding from its reach the state statute and portions of the ordinance which are counterparts of the statutory sections at issue here:

> Furthermore, RCW 9.69, entitled "Obstructing Justice," containing RCW 9.69.030–.050, as well as the portions of the Mountlake Terrace ordinance not set out in italics, are available for use where appropriate.

*Mountlake Terrace,* at 171.

In *Grant,* this court *upheld* the sections of the statute challenged as unconstitutional, specifically noting that the only language Mountlake Terrace was concerned with was subsection 1:

> The appellants contend that a city ordinance with language identical to that found in this statute was held to be unconstitutionally vague in *Mountlake Terrace v. Stone,* 6 Wn. App. 161, 492 P.2d 226 (1971). This assertion is disingenuous. Only the italicized portion of the above statute was considered and found to be unconstitutionally vague in *Mountlake Terrace v. Stone, supra.* The Court of Appeals found the remaining portion of the ordinance to be "available for use where appropriate." *Mountlake Terrace v. Stone, supra* at 171. We, too, conclude that the remaining portion of the statute is constitutionally adequate.

*Grant,* at 685–86.

We could have, but did not, hold in *Grant* that the entire statute was vague on its face. Instead, we focused on subsections 2 and 3 and *upheld* them, noting only that the holding in *Mountlake Terrace* (not controlling authority) was confined to the first subsection.

These two cases from which the police are charged to

have knowledge, before a court had ever so held, that the statute was unconstitutional, do not clearly indicate any such thing and in fact may indicate the opposite. It is doubtful that lawyers would feel comfortable predicting what the majority now requires the police to predict.

The majority accomplishes exactly what the Supreme Court suggests should be avoided. The police are now to decide not to enforce laws on the expectation that they may, at some point in the future, be off the books. We are encouraging them to second guess the judicial branch in determining the constitutionality and enforceability of statutes still on the books. It is burden enough that they must enforce the laws on the books, and are charged with knowledge of the unenforceability of laws which we have struck down, but to add a category of laws that *may* be struck down that they must then decide whether to rely on or not, is unrealistic and unfair.

We, too, believe in the underlying purpose of exclusionary rules to deter unlawful police conduct, and have no hesitation that such a purpose is legitimate and necessary. But as the Court stated in *DeFillippo,* at footnote 3:

> The purpose of the exclusionary rule is to deter unlawful police action. No conceivable purpose of deterrence would be served by suppressing evidence which, at the time it was found on the person of the respondent, was the product of a lawful arrest and a lawful search. To deter police from enforcing a presumptively valid statute was never remotely in the contemplation of even the most zealous advocate of the exclusionary rule.

*DeFillippo,* at 38.

The majority in the case before us goes well beyond that purpose, stating such things as: "we must deter *police officers from asking questions* under RCW 9A.76.020(1)", at page 104; "If we were to permit the use of evidence obtained incident to an arrest under this statute, we would *allow the Legislature to make an 'end run' around the Fourth Amendment"*, at page 107; and *"The need for deterrence of such legislative conduct in the future is as*

*essential as deterring unlawful police action*", at page 108. (Italics ours.) These objectives we do not think are countenanced under the exclusionary rule.

The majority's entire section on the Fourth Amendment is unpersuasive. The United States Supreme Court is the final arbiter of the protections afforded under the Fourth Amendment, and in *DeFillippo* it has reversed a Michigan Court of Appeals decision identical to that of the majority in this case. *Brown v. Texas,* 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979), relied upon by the majority, is not in point. It involves a suspect who, after refusing to provide I.D., was charged and convicted under Texas' stop–and–identify statute. In *DeFillippo,* twice the Court notes factual distinctions, although it does not mention *Brown.* At page 35, the Court notes "[r]espondent was not charged with or tried for violation of the Detroit ordinance." Neither was White in the case before us; he was charged with other criminal activities, as was DeFillippo.

Then at page 37, the Court states: "Assuming, *arguendo,* that a person may not constitutionally be required to answer questions put by an officer in some circumstances, the false identification violated the plain language of the Detroit ordinance." That we read as a clear reference to the facts which distinguish *DeFillippo* from *Brown.*

The same facts distinguish this case from *Brown.* White was not arrested for failing to give information or produce identification for an officer, but for lying to an officer. That in itself is suspicious conduct, borne out in both this case and *DeFillippo* by the officer's subsequent discovery of criminal acts underlying, perhaps motivating, the deception.

That *Brown* is not in conflict with *DeFillippo* is clear from the fact that Justice Burger authored both opinions and both were published on the same day. That *Brown* is not good authority for the majority's position is clear, since the facts are distinguishable while the facts of *DeFillippo* are directly in point.

As to the attempt by the majority to circumvent a clear holding of the United States Supreme Court by resorting to independent state constitutional grounds, we do not agree that article 1, section 7 (the state constitution's counterpart to the Fourth Amendment), justifies the decision reached today.

The language, if it does in fact provide more expansive protection to the individual, certainly does not broaden the exclusionary rule to the outer limits that the majority takes it in invading legislative prerogative and the enforceability of statutes yet to be declared invalid.

Lastly, we would note with disapproval the declaratory judgment tone that the majority takes in essentially warning the Legislature not to attempt to draft another such statute. This we disapprove on two bases: First, it is beyond the authority of this court to so inhibit legislation in advance. Second, we doubt that the minimal intrusion on individual freedom that such a statute, properly drafted, represents, outweighs the genuine benefit in respect to crime control. "Stop–and–identify" statutes are common nationwide, and, as the majority itself points out at page 97, such statutes "are recognized by some commentators as valuable tools to police in preventing and detecting crime and in giving additional authority to officers in sometimes dangerous street encounters."

In a period in our history when citizens are not as inclined to cooperate with police, and at the same time are fearful of the rising tide of crime, it is not appropriate for this court to altogether prohibit such legislation, but only to indicate how it can be narrowed to pass constitutional muster. After all, the statute has been around since 1909 with substantially the same wording. And the constitutions, by which the majority invalidates, as a declaratory matter all legislation of this type, have been around even longer.

We would follow *DeFillippo* and not suppress the evidence of the burglary. We would declare the present statute void for vagueness and give guidelines to the legislature for

enacting a similar, though appropriately narrowed, statute.

BRACHTENBACH, C.J., and DOLLIVER and DIMMICK, JJ.