González, J.
*226 ¶ 1 This case involves a clash of deeply significant public policies. As a modem society, we condemn domestic violence and have vested police with the power and duty to investigate and to intervene. As a society governed by our constitutions, there are limits on the State's power to punish speech, to *1162 demand an individual's active cooperation, or to intrude into a home.
¶ 2 Our homes hold a special place in our constitutional jurisprudence. It is the first place specifically called out in our constitution, and it is called out to give it special protection. Under our constitution, "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." CONST. art. I, § 7 (emphasis added). "In no area is a citizen more entitled to his privacy than in his or her home. For this reason, 'the closer officers come to intrusion into a dwelling, the greater the constitutional protection'." State v. Young, 123 Wash.2d 173, 185, 867 P.2d 593 (1994) (citation omitted) (quoting State v. Chrisman, 100 Wash.2d 814, 820, 676 P.2d 419 (1984) ). Officers must have a warrant or a well-established exception to the warrant requirement before intruding into a home. Id. at 181, 867 P.2d 593. Our constitutions also rigorously protect speech, even obnoxious speech. State v. E.J.J., 183 Wash.2d 497, 501, 354 P.3d 815 (2015).
¶ 3 Here, a bystander called 911 about a loud, late-night argument in a home. Police officers, appropriately concerned about domestic violence, went to that home to investigate. They heard an argument and demanded entry.
*227 Solomon McLemore and his girlfriend, Lisa,[1] lived in that home, refused to open their door, and told the officers to go away. Instead, the officers broke down that door under a well-established exception to the warrant requirement: community caretaking. However, when the officers found that no one was injured and that there was no evidence of any other crime, they arrested McLemore for obstruction of a law enforcement officer. This arrest appeared to be mostly based on McLemore's belligerent refusal to open his door. He was subsequently convicted of the charge. We must decide whether, under the obstruction statute as properly limited to its constitutional scope and the facts of this case, the conviction may stand. It may not.
FACTS
¶ 4 Late one night, a bystander heard a disturbance and called 911. Three Shoreline police officers responded and heard the sounds of an argument coming from an apartment above a dry cleaner's shop. Police heard a woman shouting, " '[Y]ou can't leave me out here,' " " 'I'm going to call the police,' " and "something along the lines of 'I'm reconsidering our relationship'." Clerk's Papers (CP) at 149. The officers knocked on the door of the apartment, rang the doorbell, announced they were Shoreline police, and demanded to be let in. No one in the apartment replied, but the sounds of the argument stopped. Using amplification and much profanity, the officers insisted they would break down the door if they were not let in. McLemore told them to leave. After several minutes of this, police heard the sound of breaking glass. The officers started to break down the door.
¶ 5 McLemore and Lisa lived together with their six month old son in that apartment. The couple had had a difficult night. McLemore had accidentally broken a window, *228 and Lisa was upset about having to repair it. McLemore had told Lisa he would clean up the glass but instead went to play pool with a friend. When he came home at about one o'clock in the morning, he and Lisa argued. Since their child was asleep, they took their argument outside to a balcony. McLemore claimed he accidentally locked Lisa outside on that balcony when he came in. Minutes after he let Lisa back in, the police started banging on their door. McLemore told the officers that they were okay, that he was recording the incident, and that they should leave. At McLemore's insistence, Lisa confirmed that she was fine and that she also wanted the officers to leave. Instead, rightfully concerned about domestic violence, the officers broke down her door.
¶ 6 After the door was "completely destroyed," CP at 152, the officers entered with their guns drawn, handcuffed McLemore, and put Lisa and McLemore into separate police cars. Officers determined Lisa was not *1163 injured. Lisa told the officers that the couple had not opened the door because they were afraid one of them would be arrested if they did. Officers arrested McLemore for obstruction of a law enforcement officer under RCW 9A.76.020. No other charges were filed.
¶ 7 Before trial, McLemore moved to dismiss the charge on the grounds the city had offered "no evidence that McLemore willfully hindered or delayed an officer's lawful investigation as the law does not require any duty of a person to act in a warrantless search of their residence." CP at 139. The judge denied the motion, concluding that the charges were sustainable under State v. Steen, 164 Wash.App. 789, 265 P.3d 901 (2011). The judge also excluded any defense related to McLemore's assertion that the officers did not have the right to enter without a warrant.
¶ 8 In closing argument, the city stressed that most of the elements were not in dispute. Instead, the "element that gets the bulk of the argument ... and the bulk of the scrutiny in this testimony was did the defendant willfully *229 hinder or delay or obstruct the discharge of [officers'] duties." CP at 468. The city characterized McLemore's refusal to open the door as a willful obstruction. Defense counsel argued that "[it is] not McLemore's job to help" the police and that "he did nothing. He simply sat in his house." Id. at 478.
¶ 9 During deliberations, the jury sent out one question: "Does a person have the legal obligation to follow the police instructions, in this case?"Id. at 43. The court responded, "[Y]ou have been provided with the law in this case in the jury instructions." Id. The instructions, including the to-convict instruction, mirrored the pattern jury instructions, and no specific instruction on a citizen's obligation to open a door to a warrantless entry was included. See, e.g., id. at 59; 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 120.02, at 519 (4th ed. 2016). McLemore was convicted.
¶ 10 McLemore appealed, first to the superior court, then to the Court of Appeals, and finally here. We granted review. City of Shoreline v. McLemore, 191 Wash.2d 1001, 422 P.3d 916 (2018).
ANALYSIS
¶ 11 We stress that we are not asked to determine whether the officers' forced entry in McLemore's home was lawful. McLemore, wisely, does not challenge the trial court's conclusion that the officers were exercising their community caretaking function at the time. Based on this record, the officers had the lawful power to enter McLemore's home to assess whether domestic violence had occurred and to take appropriate action if it had. See Danny v. Laidlaw Transit Servs., Inc., 165 Wash.2d 200, 208-19, 193 P.3d 128 (2008) (plurality opinion) (surveying Washington's public policy of combating domestic violence); ch. 10.99 RCW (establishing that domestic violence is a serious crime and *230 setting forth minimum standards for official responses).[2] Analogously, officers have the statutory authority to break into a home to make an arrest "if, after notice of [their] office and purpose, [they] be refused admittance." RCW 10.31.040. It is undisputed that the officers here responded appropriately and lawfully to a potential domestic violence situation in which both Lisa and the child reasonably appeared in immediate danger.
¶ 12 But McLemore was not charged with a crime of domestic violence. Instead, he was charged with violating RCW 9A.76.020(1), which provides in relevant part that "[a] person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties." In effect, McLemore contends that this statute cannot be constitutionally applied to his inaction. "We review such constitutional challenges de novo. In the context *1164 of the First Amendment, this requires a review of the record to determine that the conviction could not have been based only on constitutionally protected speech." E.J.J., 183 Wash.2d at 501, 354 P.3d 815 (citation omitted) (citing State v. Abrams , 163 Wash.2d 277, 282, 178 P.3d 1021 (2008) ); U.S. CONST. amend. I.
¶ 13 This court has long "noted that [obstruction] statutes can 'result in disturbing intrusions into an individual's right to privacy and can implicate other rights specifically enumerated in the Bill of Rights.' " State v. Williams, 171 Wash.2d 474, 481, 251 P.3d 877 (2011) (quoting State v. White, 97 Wash.2d 92, 97, 640 P.2d 1061 (1982) ). "To save the obstruction statute from being unconstitutionally overbroad in a First Amendment setting, we have construed the statute *231 narrowly. Our cases have consistently required conduct in order to establish obstruction of an officer." E.J.J., 183 Wash.2d at 501-02, 354 P.3d 815 (citing Williams, 171 Wash.2d at 485, 251 P.3d 877 ). We narrowly construe the obstruction statute even when the parties are not directly raising a constitutional challenge. Williams, 171 Wash.2d at 477-78, 251 P.3d 877.
¶ 14 We use this narrow construction for two reasons. First, we are required to interpret statutes as constitutional, if possible, and our narrowing construction accomplishes this task. See In re Pers. Restraint of Matteson, 142 Wash.2d 298, 307, 12 P.3d 585 (2000) (quoting Addleman v. Bd. of Prison Terms & Paroles, 107 Wash.2d 503, 510, 730 P.2d 1327 (1986) ). We also limit the scope of this statute to avoid chilling the exercise of constitutional rights. See State v. Rupe, 101 Wash.2d 664, 705, 683 P.2d 571 (1984) (plurality opinion) (citing State v. Frampton, 95 Wash.2d 469, 627 P.2d 922 (1981) ); see also E.J.J., 183 Wash.2d at 501-02, 354 P.3d 815.
¶ 15 Criminalizing the refusal to open one's own door to a warrantless entry would be enormously chilling and inconsistent with our deeply held constitutional values. As the United States Supreme Court observed:
From earliest days, the common law drastically limited the authority of law officers to break the door of a house to effect an arrest. Such action invades the precious interest of privacy summed up in the ancient adage that a man's house is his castle. As early as the 13th Yearbook of Edward IV (1461-1483), at folio 9, there is a recorded holding that it was unlawful for the sheriff to break the doors of a man's house to arrest him in a civil suit in debt or trespass, for the arrest was then only for the private interest of a party. Remarks attributed to William Pitt, Earl of Chatham, on the occasion of debate in Parliament on the searches incident to the enforcement of an excise on cider, eloquently expressed the principle:
"The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter-all his force dares not cross the threshold of the ruined tenement!"
*232 Miller v. United States, 357 U.S. 301, 306-07, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) (footnotes omitted) (quoting THE OXFORD DICTIONARY OF QUOTATIONS 379 (2d ed. 1953)). Even under the more limited protections afforded by the Fourth Amendment than our own constitution, "[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak." Kentucky v. King, 563 U.S. 452, 469-70, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) (citing Florida v. Royer, 460 U.S. 491, 497-98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion)); U.S. CONST. amend. IV ; see also United States v. Prescott, 581 F.2d 1343, 1350-51 (9th Cir. 1978) (holding the right to refuse a warrantless entry is not a crime or evidence of a crime (citing Camara v. Mun. Court, 387 U.S. 523, 528-29, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) ; District of Columbia v. Little, 339 U.S. 1, 7, 70 S.Ct. 468, 94 L.Ed. 599 (1950) )). Similarly, our Court of Appeals found the refusal to allow an officer into a home without a warrant was not sufficient to sustain an obstruction conviction. State v. Bessette, 105 Wash.App. 793, 799, 21 P.3d 318 (2001). The officer had been pursuing a juvenile who was spotted holding a beer bottle. Id.
*1165 ¶ 16 Under the limited construction of the statute required by our constitution, a defendant's conduct that amounts to passive delay will not sustain an obstruction charge.[3] As we ruled recently in a case where a juvenile defendant refused to retreat into his home while police were arresting his sister in the front yard:
That E.J.J.'s behavior may have caused a minor delay is of no import. Although the officer's request that E.J.J. return to his *233 home and close both doors might have been an attempt for a more convenient resolution of the situation, "[s]tates cannot consistent[ ] with our Constitution abridge those freedoms to obviate slight inconveniences or annoyances."
E.J.J., 183 Wash.2d at 506, 354 P.3d 815 (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 501-02, 69 S.Ct. 684, 93 L.Ed. 834 (1949) ). Lack of cooperation does not become obstruction of justice merely because it causes the police delay. "As a general proposition, there is no obligation to cooperate with the police." State v. D.E.D., 200 Wash.App. 484, 494, 402 P.3d 851 (2017) (citing State v. Budik, 173 Wash.2d 727, 272 P.3d 816 (2012) ). "The duty imposed by the obstructing statute is not to hinder or delay the police investigation; there is no duty to cooperate." Id. at 495, 402 P.3d 851 (citing State v. Holeman, 103 Wash.2d 426, 693 P.2d 89 (1985) ).[4] While cooperation with the police might have been wise, the failure to do so was not criminal under these circumstances.
¶ 17 The city analogizes this to cases where officers had a warrant or other court order. But the officers here did not have a warrant or other court order. No impartial magistrate authorized the intrusion. These cases are not helpful to the city. See, e.g., State v. Miller, 74 Wash.App. 334, 873 P.2d 1197 (1994). The city also analogizes to cases where a defendant actively resisted officers' warrantless entry. In State v. Line, the defendant physically struggled with officers, ripping their clothing. 121 Haw. 74, 81, 214 P.3d 613 (2009). In Dolson v. United States, the court stressed that "one has a Fourth Amendment right to deny police officers and other government officials a warrantless entry into one's home, and thus one's assertion of this right cannot serve as the basis for a criminal conviction or *234 evidence of a crime." 948 A.2d 1193, 1201 (D.C. 2008) (citing Camara, 387 U.S. at 540, 87 S.Ct. 1727 ; Little, 339 U.S. at 7, 70 S.Ct. 468 ; Prescott, 581 F.2d at 1350-51 ). The court declined to extend that principle to locking and holding a gate closed against an officer in pursuit. Id. at 1202.[5] There was no evidence here that McLemore locked the door to exclude officers, held it closed, or physically resisted. These cases are not helpful to the city either.
¶ 18 In contrast, in the vast majority of cases called to our attention, courts have held that there is no obligation to open a home to an officer's warrantless demand for entry. The city of Columbus, for example, prosecuted a man who refused to open the door to allow officers responding to a potential domestic violence call to enter his home. City of Columbus v. Michel , 55 Ohio App.2d 46, 47-48, 378 N.E.2d 1077 (1978). Officers spoke with the person who made the call, saw broken glass, knocked for 7 to 10 minutes, and told the occupants to either let them in or have their door broken down. Id. at 46-47, 378 N.E.2d 1077. The court noted that the officers were "justified in breaking open the door of the apartment to determine whether anyone was injured in the apartment." Id. at 48, 378 N.E.2d 1077. But the "defendant's failure to open the door to the apartment is not made a crime" under the ordinance. Id. ;
*1166 see also Beckom v. State , 286 Ga.App. 38, 41, 648 S.E.2d 656 (2007) (refusing to open the door or answer the phone, "without more, does not constitute obstruction of the police, even if it is the police doing the knocking and ringing"); State v. Berlow, 284 N.J.Super. 356, 364, 665 A.2d 404 (Law Div. 1995) (purpose of both the Fourth Amendment and the parallel provision of the New Jersey Constitution "is to stop governmental intrusion at the door. One cannot be penalized for passively asserting that right").
*235 Recently, the New Jersey Supreme Court, on almost identical facts, unanimously held failure to act was not obstruction. State v. Fede , 202 A.3d 1281 (N.J.2019).
¶ 19 The one exception to these cases brought to our attention by the city is Steen, 164 Wash.App. 789, 265 P.3d 901. Over a vigorous dissent, Steen held that the failure to open the door and leave a travel trailer when commanded to by an officer exercising community caretaking functions can constitute obstruction. Id. at 800, 265 P.3d 901.
¶ 20 But the Steen court relied heavily on case law that involved motor vehicles, not homes. See id. at 800-02, 265 P.3d 901 (discussing State v. Contreras, 92 Wash.App. 307, 966 P.2d 915 (1998) ). In Contreras, police responded to a report of a possible vehicle prowl and found Contreras sitting in the car. Contreras, who seemed " 'out of it,' " did not raise his hands, did not exit the vehicle, and gave only a first name. 92 Wash.App. at 309-10, 966 P.2d 915. Contreras was arrested for (though not charged with) obstruction of a law enforcement officer. Id. at 309, 966 P.2d 915. Contreras argued there was insufficient grounds for the arrest because he merely refused to speak to the officer. The court noted that mere refusal to talk to an officer is insufficient grounds to support an arrest for obstruction. But "Contreras did more than merely refuse to talk. He also disobeyed the officer's orders to put his hands up in view of [the officer], to exit the car, to keep his hands on top of the car, and to provide his name." Id. at 316, 966 P.2d 915.
¶ 21 Not surprisingly, Contreras itself also relied largely on cases involving motor vehicles. See Contreras , 92 Wash.App. at 316-17, 966 P.2d 915 (citing State v. Hudson, 56 Wash.App. 490, 497-98, 784 P.2d 533 (1990) ; State v. Little, 116 Wash.2d 488, 497, 806 P.2d 749 (1991) (plurality opinion); State v. Mendez, 88 Wash.App. 785, 792-93, 947 P.2d 256 (1997), rev'd, 137 Wash.2d 208, 970 P.2d 722 (1999) ; City of Sunnyside v. Wendt, 51 Wash.App. 846, 851-52, 755 P.2d 847 (1988) ). Hudson, Mendez, and Wendt all implicated statutes that require drivers to cooperate with law enforcement. Little was brought under a former version of the obstruction *236 statute that was significantly revised after being repeatedly held unconstitutional. See S.B. REP. ON S.B. 6138, 53d Leg., Reg. Sess. (Wash. 1994); White, 97 Wash.2d at 103, 640 P.2d 1061 (describing the previous version of the statute as "flagrantly unconstitutional"). Washington law imposes on drivers and witnesses to traffic accidents a duty to cooperate with officers in many circumstances. E.g., RCW 46.61.020, .021. While Washington law vests officers with the statutory authority to break into a house under certain circumstances, see, e.g., RCW 10.31.040, there is no law requiring people to open their own doors to officers seeking warrantless entry.
¶ 22 Location matters. A home is entitled to constitutional protections that a moving vehicle is not. See State v. Ferrier, 136 Wash.2d 103, 112, 960 P.2d 927 (1998). " '[T]he closer officers come to intrusion into a dwelling, the greater the constitutional protection.' " Id. (internal quotation marks omitted) (quoting Young, 123 Wash.2d at 185, 867 P.2d 593 ). To the extent Steen suggests it is obstruction to not open the door to a home in response to a warrantless knock, it is inconsistent with Washington law and is overruled. See Williams, 171 Wash.2d at 485, 251 P.3d 877 ; White, 97 Wash.2d at 97, 640 P.2d 1061.
¶ 23 Under the limited construction we are required to give the obstruction statute to render it constitutional, the city presented insufficient evidence to sustain this conviction. Taken in the light most favorable to the city, McLemore refused to open the door, loudly insisted he had no obligation to do so, and told Lisa to tell the officers she was okay. None of this is punishable "conduct" under our limiting construction of the obstruction statute. Further, our review of the record leaves us with an abiding concern the jury could have convicted on speech alone.
*1167 See E.J.J., 183 Wash.2d at 501, 354 P.3d 815 (citing Abrams, 163 Wash.2d at 282, 178 P.3d 1021 ). Much of the evidence focused on what McLemore and the officers shouted at one another. There was no evidence presented *237 that McLemore closed his door to prevent the officers' entry or prevented Lisa from opening it. Accordingly, we reverse.[6]
CONCLUSION
¶ 24 We in the lead opinion would hold the city presented insufficient evidence to sustain McLemore's conviction and remand to the trial court for further proceedings consistent with this opinion. However, we recognize this opinion has garnered only four signatures. "Therefore, there being no majority for the reversal of the judgment of the trial court, it necessarily stands affirmed, and the order of this court is that the judgment appealed from be and it is hereby affirmed." Peterson v. City of Tacoma ,139 Wash. 313, 313, 246 P. 944 (1926).
WE CONCUR:
Fairhurst, C.J.
Johnson, J.
Gordon McCloud, J.

We use only Lisa's first name to avoid subjecting her to unwanted publicity. No disrespect is intended.

The dissent states that "everyone, including McLemore, agrees that the officers responding to the domestic violence call had the constitutional authority to demand entry pursuant to the community caretaking exception to the warrant requirement" and that "McLemore did have a duty to comply with lawful police orders to open the door." Dissent at 1, 8. We respectfully disagree with this characterization of the case. We agree that the officers had the constitutional authority to enter the home pursuant to the community caretaking exception to the warrant requirement. We do not agree that McLemore had a duty to comply with the police's demand to open the door.

The dissent claims that "refusal to obey lawful orders of law enforcement has always been deemed sufficient conduct to support an obstruction conviction." Dissent at 11. We have never so held, and, under our limiting construction of the obstruction statute, it cannot be.

Indeed, the jury's question during deliberation, "Does a person have the legal obligation to follow the police instructions, in this case?" touches on this vital principle. CP at 43. We do not fault the judge for not answering it during deliberations. But this case does turn on when a person has a legal obligation to follow an officer's directions.

This, of course, is what distinguishes Dolson's conduct from McLemore's. Dolson shut his gate, locked it, and held it shut to keep out the police. Dolson, 948 A.2d at 1197. McLemore refused to open an already-locked door. Because of Dolson's active resistance, he was not entitled to a passive resistance instruction. Id. at 1201. McLemore did not resist, he simply did not open the door. But see dissent at 16 (treating Dolson's active resistance as analogous).

Given our disposition, we do not reach the remaining arguments. We note in passing that it is questionable whether a defendant can appeal the denial of a Knapstad motion after the case has gone to trial. State v. Zakel, 61 Wash.App. 805, 811 n.3, 812 P.2d 512 (1991) (declining to review a denial of a Knapstad motion after trial); State v. Knapstad, 107 Wash.2d 346, 729 P.2d 48 (1986) ; CrR 8.3(c)(3) ("A decision denying a motion to dismiss under this rule is not subject to appeal under RAP 2.2.").