**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexis...This opinion was filed for record...waseports/.

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUN 2 5 2015
Madsen, C.J.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on June 25, 2015

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 88694-6 |
| Respondent, | ) | |
| v. | ) | En Banc |
| E.J.J., | ) | |
| Petitioner. | ) | Filed ___ JUN 2 5 2015 ___ |

JOHNSON, J.—This case challenges, on grounds under the First Amendment to the United States Constitution, a juvenile court "conviction" for obstructing a law enforcement officer under RCW 9A.76.020(1). The Court of Appeals affirmed the trial court. The basis for the prosecution centers on E.J.J. calling the officers abusive names, yelling, and using profanity toward the officers while they were engaged in a criminal investigation. We find insufficient evidence to support the conviction and that E.J.J.'s words directed at the officers are constitutionally protected. We reverse the conviction and dismiss.[1]

---

[1] Because we resolve this case on First Amendment grounds, we do not address E.J.J.'s privacy claim.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. E.J.J.*, No. 88694-6

FACTS AND PROCEDURAL POSTURE

This case began as a call for police assistance to E.J.J.'s house to help with his intoxicated, out-of-control sister, R.J. (a juvenile at the time). The police responded and began their intervention by escorting R.J. out of the house 10 to 15 feet away from the front door, where the officers attempted to calm her down. E.J.J. grew concerned when he saw an officer reach for what he perceived to be a nightstick.[2] E.J.J. exited the house and stood on the porch, telling the officers that R.J. was his sister and that they should not use the nightstick. The officers advised him that they were in the middle of their investigation and instructed him multiple times to leave the scene and return to the house. Initially, E.J.J. did not comply, questioning why he had to return to the house. When, eventually, he did return to his home, he stood in the open doorway and continued his verbal interaction with the officers. The house had double doors: a wrought iron screen door, through which someone could see out and communicate through, and a second, solid wood door. The officers directed E.J.J. multiple times to close the solid wood door and to withdraw further into the home, but E.J.J. refused, stating that he wanted to supervise the scene from the doorway (10 to 15 feet away from the other officers

_____

[2] The record is unclear as to whether the officer actually pulled the nightstick. But it is of no import to this case whether the nightstick was actually pulled. Instead, we are dealing with E.J.J.'s reaction to what he *perceived at the time* as a nightstick being pulled on his sister.

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. E.J.J.*, No. 88694-6

and R.J.) to make sure that R.J. was not harmed. E.J.J. continued to stand behind the closed wrought iron door. Multiple times, an officer reached into the home to close the solid door. E.J.J. would immediately reopen it. At this point, E.J.J. was irate, yelling profanities and calling the officers abusive names.[3] An officer warned E.J.J. that he could be arrested for obstruction. After E.J.J. continued to reopen the solid door, an officer put him under arrest for obstruction of a law enforcement officer. The entire interaction lasted approximately 10 to 15 minutes.

STANDARD OF REVIEW

The free speech provision of the First Amendment[4] stands as a guardian protecting citizens against criminal prosecution when exercising their constitutional right to speak, to witness and engage in the political process, and to criticize certain governmental activities. Historically, First Amendment values have occupied a crucial place in shaping our democracy. Cases have consistently and strongly held that people cannot be held liable when exercising their right to speak. While E.J.J.'s words may have been disrespectful, discourteous, and annoying, they are nonetheless constitutionally protected.

_____

[3] According to the officers, E.J.J. resorted to the use of profanity towards them. E.J.J. testified that the officers were also yelling profanities and calling him names.

[4] "Congress shall make no law . . . abridging the freedom of speech, or of the press."

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. E.J.J.*, No. 88694-6

E.J.J. challenges the obstruction statute as unconstitutional as applied to his behavior. We review such constitutional challenges de novo. *State v. Abrams*, 163 Wn.2d 277, 282, 178 P.3d 1021 (2008). In the context of the First Amendment, this requires a review of the record to determine that the conviction could not have been based only on constitutionally protected speech.[5] The obstruction statute provides, "A person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties." RCW 9A.76.020(1). To save the obstruction statute from being unconstitutionally overbroad in a First Amendment setting, we have construed the statute narrowly. Our cases have consistently required *conduct* in order to establish obstruction of an officer. *State v. Williams*, 171 Wn.2d 474, 485, 251 P.3d 877 (2011). In other words, a conviction for obstruction may not be based solely on an individual's speech because the speech itself is constitutionally protected. This review is also consistent with the approach established by the United States Supreme Court. *See Street v. New York*, 394 U.S. 576, 578, 89 S. Ct. 1354, 22 L. Ed. 2d 572 (1969).

---

[5] Although most First Amendment cases involve challenges to statutes or ordinances, our review of the sufficiency of the evidence in this case is similar to the standard of review in any other First Amendment case.

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. E.J.J.*, No. 88694-6

Washington courts have long limited the application of obstruction statutes, lest those statutes infringe on constitutionally protected activity. In *Stone*, the Court of Appeals invalidated portions of a city obstruction ordinance that criminalized the defendant's refusal to identify himself to police officers. *City of Mountlake Terrace v. Stone*, 6 Wn. App. 161, 492 P.2d 226 (1971). In *Grant*, this court invalidated portions of a similar state obstruction statute but held that the remainder of the obstruction statute was constitutionally adequate because it focused on conduct rather than speech. *State v. Grant*, 89 Wn.2d 678, 575 P.2d 210 (1978). Four years after *Grant*, we reviewed the successor obstruction statute, former RCW 9A.76.020 (1975).[6] *State v. White*, 97 Wn.2d 92, 640 P.2d 1061 (1982). Although we held that subsections (1) and (2) were constitutionally overbroad, we left intact subsection (3), which made it a misdemeanor to "'knowingly hinder, delay, or obstruct'" a public servant. *White*, 97 Wn.2d at 96 (quoting former RCW 9A.76.020). Following *White*, in cases where defendants were charged under subsection (3) by giving false names or refusing to give any

---

[6] "**Obstructing a public servant.** Every person who, (1) without lawful excuse shall refuse or knowingly fail to make or furnish any statement, report, or information lawfully required of him by a public servant, or (2) in any such statement or report shall make any knowingly untrue statement to a public servant, or (3) shall knowingly hinder, delay, or obstruct any public servant in the discharge of his official powers or duties; shall be guilty of a misdemeanor."

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

information to police—paradigmatic speech activity—our Court of Appeals correctly reasoned that subsection (3) requires conduct, not speech alone. *See State v. Hoffman*, 35 Wn. App. 13, 16-17, 664 P.2d 1259 (1983). Although our courts resolved these cases on the bases of due process and vagueness, the fundamental principle is the same. In order to satisfy our state and federal constitutions, obstruction statutes must have articulable, clear standards that do not impair important constitutional activities, such as speech.

After the legislature adopted the current obstruction statute, our courts continued to require conduct in order to survive a constitutional challenge. The current obstruction statute contains only the "willfully hinders, delays, or obstructs" subsection of the former statute. Former RCW 9A.76.020(1). Reviewing this revised language, the Court of Appeals in *Williamson* reversed the obstruction conviction of the defendant who falsely told police his name was "'Christopher Columbus.'" *State v. Williamson*, 84 Wn. App. 37, 45, 924 P.2d 960 (1996). The court reasoned that the defendant's response was speech, not conduct. *Williamson*, 84 Wn. App. at 43-45.

In *Williams*, we thoroughly discussed the history of cases analyzing the concerns our courts have long held in relation to attempts to criminalize incidents where speech is involved. We emphasized the concern that police could use this

*State v. E.J.J.*, No. 88694-6

statute to detain and arrest individuals solely for their speech. In *Williams*, we vacated the defendant's conviction for obstruction when he gave a false name to police during a traffic stop, holding that "in order to avoid constitutional infirmities" we require some conduct to support a conviction. *Williams*, 171 Wn.2d at 478. As our history makes clear, conduct is prerequisite of an obstruction charge.

Given the important First Amendment rights at stake, we are required to engage in a careful review of the record to ensure that E.J.J.'s conviction *could not* have been based on speech alone.[7] This analysis is consistent with the United States Supreme Court's holding in *Street*. In *Street*, the defendant burned an American flag in the street, telling police, "'We don't need no damn flag.'" *Street*, 394 U.S. at 579. The defendant was convicted under a New York statute that made it a misdemeanor to "'publicly . . . mutilate, deface, defile . . . or cast contempt upon either by words or act'" any flag of the United States. *Street*, 394 U.S. at 578

---

[7] A conviction may be based on an individual's conduct even if he or she engaged in protected speech. Freedom of speech does not immunize speech used as an integral part of conduct in violation of a valid criminal statute. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498, 69 S. Ct. 684, 93 L. Ed. 834 (1949). Furthermore, not all speech is protected from punishment under the obstruction statute. This case would certainly be different if E.J.J.'s speech fell within one of the unprotected speech categories. *See State v. Kilburn*, 151 Wn.2d 36, 42-43, 84 P.3d 1215 (2004) (listing libel, fighting words, incitement, obscenity, and child pornography). The State, however, does not claim that E.J.J.'s speech fit into any of these categories.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. E.J.J.*, No. 88694-6

(quoting N.Y. PENAL LAW § 1425). After holding that a person may not constitutionally be convicted for speaking contemptuous words about the flag, the United States Supreme Court held that it was compelled to reverse the conviction because given the record, the way Street was charged, and the general verdict entered, he could have been convicted for his speech alone. *Street,* 394 U.S. at 590; *see also Williams v. North Carolina,* 317 U.S. 287, 292, 63 S. Ct. 207, 87 L. Ed. 279 (1942) ("To say that a general verdict of guilty should be upheld though we cannot know that it did not rest on the invalid constitutional ground . . . would be to countenance a procedure which would cause a serious impairment of constitutional rights."). Washington cases also follow this analysis. *See Williamson,* 84 Wn. App. at 44-45 (presuming prejudice when defendant was convicted of obstruction solely because he gave a false name). Thus, this case turns on whether the record suggests that E.J.J. was convicted of obstruction based solely on his words.[8]

---

[8] The chief justice wrongly criticizes our review of the record, claiming that we have disregarded the trial court's findings of fact. Concurrence (Madsen, C.J.) at 1. However, it is the chief justice that disregards the constitutional standard of review that requires scrutiny of not only the trial court's findings but of the entire record to ensure that the conviction could not have been based on protected speech alone. *See Street,* 394 U.S. at 590 (reversing conviction because review of the record could not establish that the conviction was based on conduct and not solely on speech). The standard of review announced in *Street* is also in accord with the standard we announced in *Williams. Williams,* 171 Wn.2d at 485.

8

*State v. E.J.J.*, No. 88694-6

The State argues that in addition to his abusive speech directed at the officers, E.J.J. engaged in conduct by approaching the officers while they were trying to calm R.J. down and by refusing to obey the officers' requests to return to the house and close both the wrought iron and solid wood doors. The Court of Appeals agreed, holding that the record supported the trial court's determination that E.J.J. was guilty of obstruction. We address each fact relied on by the Court of Appeals in turn.

First, the Court of Appeals determined that E.J.J.'s physical approach toward the officers was sufficient evidence of conduct to support his conviction. We disagree. The record indicates that E.J.J. did not physically interfere with or touch either the police or his sister. Furthermore, the trial court's findings of fact provide that E.J.J. did not make any threatening movements toward the officers at any time. Clerk's Papers at 14. This conduct is insufficient to support his conviction for obstruction.

The second "fact" relied on by the Court of Appeals was that E.J.J.'s presence at the scene escalated the situation. But E.J.J.'s mere presence at the scene cannot constitute conduct. E.J.J. had every right to stand on his own property, provided he did not physically interfere with police. Moreover, other than this generalized claim of interference, nothing in the record establishes any

9

connection between E.J.J.'s speech or presence and anything that specifically resulted from it.

Third, the Court of Appeals held that E.J.J.'s refusal to obey the officers' repeated requests to leave the scene was sufficient evidence of conduct. More precisely, it appears that the Court of Appeals agreed with the trial court that E.J.J. obstructed police when he became irate, hurled abuses on the officers, and refused to close the solid wood door to his home. But this exchange is so intertwined with E.J.J.'s protected speech that we find insufficient evidence of E.J.J.'s conduct to support his conviction on this basis. The trial judge said as much when commenting, "If [E.J.J.] had simply stood there . . . and observed the situation and if the officers had said close the door and he had disobeyed that order, [they] might not be here today and there could very well not be sufficient evidence of obstruction." Report of Proceedings (RP) at 99. This recognition by the trial court is telling because it implies that the trial judge based the conviction on E.J.J.'s refusal to close the door and his abusive statements toward police, and not on E.J.J.'s approach toward the police officers. Most importantly, because we cannot be confident that his words did not support the trial court's conclusion that the front door exchange constituted obstruction (quite the opposite, E.J.J.'s speech

*State v. E.J.J.*, No. 88694-6

appears to be dispositive), we find insufficient evidence of conduct from the exchange between E.J.J. and police at the front door.

Finally, the Court of Appeals found sufficient evidence of obstruction from the fact that an officer was eventually required to escort E.J.J. back to the home, thus delaying officers. That E.J.J.'s behavior may have caused a minor delay is of no import. Although the officer's request that E.J.J. return to his home and close both doors might have been an attempt for a more *convenient* resolution of the situation, "[s]tates cannot consistently [sic] with our Constitution abridge those freedoms to obviate slight inconveniences or annoyances." *Giboney,* 336 U.S. at 501-02. In the First Amendment context, we must be vigilant to distinguish between obstruction and inconvenience. As the Fourth Circuit Court of Appeals remarked, "[I]nconvenience cannot, taken alone, justify an arrest [for obstruction]." *Wilson v. Kittoe,* 337 F.3d 392, 401 (4th Cir. 2003) (affirming trial court's ruling that plaintiff properly alleged insufficient probable cause to support his arrest for obstruction when he refused to obey orders to cease and depart the scene). And as the trial court in *Kittoe* noted, "When protected speech is added to the equation in punishing an individual for refusing to comply with an order to disperse," and in a situation that is "littered with potential for abuse of First Amendment rights," the State's ability to punish under an obstruction statute could

11

*State v. E.J.J.*, No. 88694-6

give the State "a mask for unconstitutional conduct." *Wilson v. Kittoe,* 229 F. Supp. 2d 520, 531, 532 (2002), *aff'd*, 337 F.3d 392.

Likewise, obstruction statutes may not be used to limit citizens' right to express verbal criticism, even abusive criticism, at police officers. The United States Supreme Court recognized this protection in *City of Houston v. Hill*, 482 U.S. 451, 454, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987). In *Hill*, the defendant watched as police approached a friend. Believing that the police officers were going to punch his friend, Hill began shouting at police, telling them to "'pick on somebody your own size.'" *Hill*, 482 U.S. at 454. Hill was arrested under a municipal obstruction ordinance. In declaring that ordinance invalid under the First Amendment, the Court sagely remarked that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Hill*, 482 U.S. at 462-63. The similarity between the facts of *Hill* and the present case are striking.[9] Furthermore, the record demonstrates that the officers in this

---

[9] The chief justice criticizes our reliance on *Hill*, arguing that *Cox v. Louisiana*, 379 U.S. 559, 563, 85 S. Ct. 476, 13 L. Ed. 2d 487 (1965), is more analogous. Concurrence (Madsen, C.J.) at 12-13. We disagree. *Cox* involved a constitutional challenge to a statute that prohibited picketing near courthouses. Dispositive to the holding was that there is a substantial public interest in an impartial justice system free from intimidation and that the statute was precisely and narrowly drawn to specific types of behavior in a very limited area (in or near courthouses). *Cox*, 379 U.S. at 562. The obstruction statute at issue in this case, by contrast, applies throughout

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. E.J.J.*, No. 88694-6

case ordered E.J.J. to close the solid wood door in order to silence his harsh criticism and observation of police activity. [10] In conclusion, we find that there is not sufficient evidence to support E.J.J.'s conviction.

The chief justice argues that we have ignored the unchallenged findings of fact and that those findings fully support the conclusion that E.J.J. was convicted on the basis of his conduct. Concurrence (Madsen, C.J.) at 1. The chief justice's concurrence is problematic and fails to apply the proper constitutional standard of review. Simply put, we cannot be certain that E.J.J.'s conviction was not based on his speech alone. The trial court's unchallenged findings of fact certainly do not support a contrary result.

## CONCLUSION

Where individuals exercise their constitutional rights to criticize how the police are handling a situation, they cannot be concerned about risking a criminal conviction for obstruction. Such a conviction is not permitted under the First Amendment. After a comprehensive review of the record and the trial court's findings, the

---

the state and does not specify certain types of behavior beside the rather broad language "hinders, delays, or obstructs."

[10] At trial, the following exchange occurred between defense counsel and an officer who was testifying:

"Q. . . . And so you wanted him to shut the inside door so the more solid door that you could not see out of, so that he would not be able to see what was going on, correct?

"A. Yes, correct, yes." RP at 52.

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. E.J.J.*, No. 88694-6

decision of the trial court is reversed and charges are dismissed.

WE CONCUR:

*State v. E.J.J.*

No. 88694-6

MADSEN, C.J. (concurring)—I concur with the majority's reversal of E.J.J.'s conviction, but on different grounds. I cannot sign the majority because I disagree with the majority's description of the facts as found by the judge, its characterization of the basis for the trial court's ruling, and the majority's legal analysis in light of relevant, unchallenged findings of fact. Given the testimony of the witnesses and the inferences in favor of the state on sufficiency review, there is ample evidence of E.J.J.'s obstructive *conduct* to affirm his conviction for obstructing a law enforcement officer under RCW 9A.76.020(1).

Because this case presents a well-settled point of law regarding sufficiency of the evidence to sustain a conviction, the only reason for this court's review is because it has been called to the court's attention that the crime of obstruction is used disproportionately to arrest people of color. Thus, despite the fact that sufficient evidence supports the conviction under the current law, I believe this court must take this opportunity to add a common law requirement to the obstructing statute to ensure its constitutional application as follows: where the officer's conduct substantially contributed to the escalation of the circumstances that resulted in the arrest for obstruction, the state has failed to meet its

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

burden to show that the defendant willfully hindered, delayed, or obstructed a law enforcement officer in the discharge of his or her official powers or duties. Under this common law requirement the State would be required to prove that the defendant's obstructing conduct was not substantially produced by the officer's escalating conduct.[1] This additional requirement is necessary because our system of justice cannot condone disparate treatment of the people we serve, based on race, through the use of obstruction statutes. Applying this requirement here, E.J.J.'s conviction must be reversed.

Discussion

The Broader Context of This Case Requires a New Rule

The concerns raised by E.J.J. and amicus American Civil Liberties Union of Washington about the potential for abuse of the obstruction statute at issue here, particularly in communities where there exists tension with law enforcement and questions of excessive force, are real. According to a report from the auditor of the Office of Professional Accountability (OPA), 51 percent of the obstruction charges filed in Seattle during a two-year period were filed against African Americans, even though African Americans comprise only about 8 percent of Seattle's population.[2] When called

---

[1] As a practical matter, the State could meet its burden by proving police attempted to de-escalate the situation through approved de-escalation techniques.

[2] City of Seattle Office of Prof'l Accountability, Auditor's Report on Obstruction Arrests: January 2006-July 2008, at 7 (2008), *available at* http://www.seattle.gov/Documents/Departments/OPA/Auditor/AuditorObstruction.pdf; *see also* City of Seattle Office of Intergovernmental Relations, The Greater Seattle Data Sheet, Demographics, Population by Race in 2010, *available at* http://www.seattle.gov/oir/datasheet/demographics.htm (noting Seattle African American population as 8.4 percent).

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

to the attention of the court, we must not condone practices that visit severe consequences on one particular segment of the community and we must consider the conduct of police in charges of obstruction when obstruction laws are used disproportionately in contacts with African Americans.

Accordingly, in my view, in the context of this case we should take judicial notice of the recent settlement of the United States Department of Justice (DOJ) claims against the city of Seattle concerning the Seattle Police Department (SPD) practices when the events underlying this case occurred.[3] In a complaint filed July 27, 2012 (Complaint), the DOJ determined that "SPD engages in patterns or practices of using unlawful force that systematically deny the people of Seattle their constitutional rights." Complaint at 2.[4] Of significance here, the DOJ's complaint alleged that "SPD officers *escalat*[e] situations and us[e] excessive force when arresting individuals for minor offenses, particularly during encounters with persons with mental illnesses and those under the influence of alcohol or drugs." Complaint at 3. "SPD's routine failure to report and investigate use of force incidents, to hold officers accountable for improper uses of force, or to emphasize the importance of de-escalation facilitates a supervisory culture where

---

[3] *See United States v. Wilson*, 631 F.2d 118, 119 (9th Cir.1980) ("Fed.R.Evid. 201(b)(2) permits judicial notice of a fact that is 'not subject to reasonable dispute in that it is . . . (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' In particular, a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases." (alteration in original)); *see also* ER 201(b)(2).

[4] The noted Complaint, which was filed in the United States District Court for the Western District of Washington at Seattle, in *United States v. City of Seattle,* Cause No. 12-CV-1282, is available on the DOJ's website at http://www.justice.gov/iso/opa/resources/877201272719531542159.pdf.

3

excessive force is tolerated." *Id.*[5] As a part of the "Settlement Agreement" reached between the city of Seattle and DOJ, the department committed to provide training for officers and supervisors on the appropriate use of de-escalation techniques. Settlement Agreement at 35, 36.[6] As discussed below, no such techniques were employed here.

Based on the alarming statistics regarding the SPD's use of minor charges, such as obstruction, disproportionately when interacting with African American, Latino, Asian, and mentally ill members of our community, and recognizing the SPD's agreement to reform its practices, we should not look only to the conduct of the defendant, but we should also consider the conduct of the police officers in their interactions with members of the public to ensure that police conduct does not deprive persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

As discussed below, it is apparent that in this case the arresting officer unnecessarily escalated the situation when E.J.J. refused to close the front door. At that point it appears that E.J.J. and the officer were involved in a contest of wills, and the officer won because he had the power of arrest.

In line with the Settlement Agreement reached between the city of Seattle and the DOJ, officers could have employed de-escalation strategies when responding to E.J.J.'s

---

[5] The DOJ investigation addressed SPD conduct over "a recent two-year period" and is thereby relevant to the time period and events in this case. Complaint at 3.

[6] The Settlement Agreement is available on the DOJ's website at http://www.justice.gov/iso/opa/resources/407201283174056123976.pdf.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

concern for his sister's welfare.[7] Rather than de-escalating the situation, however, one officer chose to push his authority beyond that necessary to secure the scene, resulting in the arrest and conviction of an African American teenager, further eroding the confidence of the community in the justice system.[8]

---

[7] The "Memorandum of Understanding" accompanying the Settlement Agreement acknowledges "Community Engagement" goals, stating, "SPD needs strong community relationships and sustainable dialogue with Seattle's diverse communities to ensure constitutional and bias-free policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence in the Department." DEP'T OF JUSTICE, MEMORANDUM OF UNDERSTANDING BETWEEN THE U.S. AND THE CITY OF SEATTLE at 3 (July 27, 2012), *available at* http://www.justice.gov/iso/opa/resources/592201283174042815512.pdf. Such goals respond in part to the problems identified in the DOJ's complaint, which included SPD's continuing failure to implement "training that assists officers in de-escalating situations." Complaint at 12-13.

[8] According to a 2012 report by the Washington State Minority and Justice Commission titled *Justice in Washington State Survey*, "'African Americans and Whites are on two different ends of the spectrum, with the former exhibiting strong signs of cynicism about the ability of the justice system to provide fair, impartial, and respectful justice, and the latter displaying substantially more confidence and trust in the system.'" WASH. STATE MINORITY & JUSTICE COMM'N AND WASH. STATE CTR. FOR CT. RESEARCH, JUSTICE IN WASHINGTON STATE SURVEY: 2012 (REVISED AND UPDATED 2014) at 1, *available at* http://www.courts.wa.gov/content/publicUpload/News/Justice%20in%20Washington%20Report. pdf. Latinos were only "'somewhat less critical'" than African Americans. *Id.* The report also noted the disproportional impact of police encounters. When asked about their personal encounters with police officers and the courts, the study found substantial differences between Whites and African Americans in terms of the frequency of negative encounters. Specifically, Black respondents reported being treated both "'unfairly'" and "'disrespectfully'" far more often. *Id.* In the most extreme case, while only 11 percent of Whites report disrespectful treatment from the police at least once, fully 62 percent of African Americans make note of such treatment. *Id.* Latinos report more contentious contacts with police than Whites, though somewhat fewer such contacts relative to African Americans, and approximately one-third of Asian Americans surveyed reported disrespectful treatment by police. *Id.* "Personal negative encounters with the police have a far ranging impact on how individuals . . . assess the broader justice system. . . . The more frequently individuals report being treated unfairly or disrespectfully by the police, the less likely they are to agree that the 'justice system . . . treats people fairly and equally' and/or 'the courts . . . can usually be trusted to give everyone a fair trial.'" *Id.* at 2. Accordingly, encounters with police play a critical role "in shaping citizens' views of the broader criminal justice system." *Id.* Further,

No. 88694-6
Madsen, C.J., concurring

We have an obligation to promote confidence in the courts and our justice system. While studies verify the prominent impact of negative police contacts on the citizenry's general perceptions of fairness and bias in our justice system,[9] we must do more than merely study the problem. In order to ensure that the obstruction statute is not abused as a tool of biased policing, I would add a common law requirement to the statute's provisions as described above. Adding this common law requirement to the obstruction statute is an appropriate response addressing this case and the broader concern of police conduct in this context.[10] It will preserve the proper utility of the obstruction statute while guarding against the statute's misuse.

---

The impact of negative personal encounters with the police . . . is greatly magnified through "discussion networks," or the acquaintances with whom citizens tend to discuss their experiences. African Americans are, other things equal, far more likely to discuss their police encounters with other African Americans, encouraging a tendency for them to base their evaluations of the justice system not just on personal experiences, but on vicarious experiences with acquaintances, as well. Even Blacks who have not had personal negative encounters with law enforcement, therefore, have often spoken with someone who has experienced such an interaction, potentially leading to more critical assessments of the justice system even among those not personally affected by it.

*Id.* at 3.

[9] *See supra* note 7. Moreover,

[A]ttitudes about the fairness of the justice system are likely to color citizens' views of much of the rest of the political system. . . . [P]eople who believe the justice system to be unfair tend to evaluate the entire political system as less legitimate. The justice system is as close as many come to the government; thus, low levels of confidence in the [criminal justice system] can clearly undermine support for the broader system.

Jon Hurwitz & Mark Peffley, *Explaining the Great Racial Divide: Perceptions of Fairness in the U.S. Criminal Justice System*, 67 J. POL. 762, 764 (Aug. 2005), *available at* http://www.polisci.pitt.edu/sites/default/files/pubs/HurwitzPeffley.2005.RacialDivide.pdf.

[10] *Cf. State v. Bradshaw*, 152 Wn.2d 528, 538, 98 P.3d 1190 (2004) (acknowledging that the judge-made affirmative defense of unwitting possession "ameliorates the harshness of [the] strict liability crime" of possession of a controlled substance). Here, although the added requirement is not an affirmative defense, it is similarly designed to ameliorate the inequity of

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Moreover, I would apply this new requirement in the present case, as well as prospectively, just as the Supreme Court applied the new advisement requirements announced in its *Miranda* decision.[11] As in *Miranda*, the newly minted requirement here would serve as a prophylactic against "overzealous police practices." *Miranda*, 384 U.S. at 444. As *Miranda* acknowledged, improper police conduct "'lowers the esteem in which the administration of justice is held by the public.'" *Id*. at 448 (quoting IV NAT'L COMM'N ON LAW OBSERVANCE & ENFORCEMENT, REPORT ON LAWLESSNESS IN LAW ENFORCEMENT 5 (1930)). Like *Miranda*, the new requirement's purpose is to assure the eradication of improper police practices. *See id*. at 447. This new requirement similarly provides "concrete . . . guidelines for law enforcement agencies and courts to follow," which will thereby "'contribute directly to a more effective, efficient and professional level of law enforcement.'" *Id*. at 442, 441 n.3 (quoting L.A. Times at 1 (Oct. 2, 1965)).

On this basis, I would concur in the majority's reversal of E.J.J.'s conviction. I turn now to my disagreement with the majority's analysis, which, in my view, does not credit the salient facts establishing E.J.J.'s conduct and ignores pertinent case law.

The Present Case Turns on E.J.J.'s Conduct

The obstruction statute under which E.J.J. was convicted provides:

---

biased policing by considering the conduct of police employing the obstruction statute. Police are critical to a functioning society, and biased policing diminishes this critical role.

[11] *See Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (articulating advisement requirements that police must perform prior to commencing in-custody interrogation of suspects).

> A person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties.

RCW 9A.76.020(1).

The charge against E.J.J. proceeded to a bench trial in juvenile court. The trial court's findings of fact are either unchallenged or supported by substantial evidence and are thus binding on appeal. On appeal, E.J.J. assigned error to only two of the trial court's 27 findings of fact, finding of fact 19 and 21. *See* Appellant's Opening Br. at 2. All other unchallenged findings are verities on appeal. *State v. B.J.S.*, 140 Wn. App. 91, 97, 169 P.3d 34 (2007). Where challenged findings are supported by substantial evidence, those findings also are binding on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003); *see also State v. Halstien*, 122 Wn.2d 109, 129, 857 P.2d 270 (1993).[12] Those findings are summarized as follows.

---

[12] Finding of fact 19 stated that the officers "had legitimate safety concerns to not leave their backs exposed to an open door of a house that had not been swept for weapons, with an individual in the immediate vicinity who had not been patted down for weapons." Clerk's Papers (CP) at 15. Both testifying officers expressed their concerns for officer safety at the time because E.J.J. was hostile and yelling at them, he approached them from behind interjecting himself into the scene of their investigation, he had not been patted down for weapons, and when he was placed back into the house by an officer he refused to close the front door. Report of Proceedings (RP) at 19, 20, 30, 39-43, 54-56. Officer Sean Jenkins testified that it was unsafe for the officers to have the front door open because as they dealt with E.J.J.'s sister in the front yard they had their backs to the door, which left them vulnerable to attack.

Finding of fact 21 states that E.J.J. "could have observed the police, while complying with their orders [to close the front door], from a front window inside of the house." CP at 16. E.J.J. admitted during testimony that he could have observed the officers just as well from the window as from the open door. RP at 78-79. Substantial evidence supports the challenged findings.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

On the night of February 14, 2011, E.J.J.'s mother, Geraldine, called 911 for help to get her daughter, R.J., to leave her King County home. R.J. was heavily intoxicated and agitated. E.J.J. lives with his mother and was home when she called 911.

Officer Sean Jenkins and two other officers responded to the call and escorted R.J. out of the home. As the officers talked with R.J. in the yard, E.J.J. stepped off the porch and approached the officers and R.J. The officers had calmed R.J. down, but when E.J.J. began speaking in a loud and excited voice, R.J. became agitated. "[E.J.J.] knew that his presence was making it difficult for the officers to keep [R.J.] still and calm." Clerk's Papers (CP) at 14 (Finding of Fact 9).

The officers asked E.J.J. at least five times to go back inside the house and shut the door, warning E.J.J. that he was obstructing their investigation and could be arrested, but E.J.J. refused the officers' requests. Officer Jenkins ultimately walked E.J.J. to the front door and instructed him to go inside and close the front door. E.J.J. called the officers several insulting names and was yelling and swearing as Officer Jenkins walked him to the door. E.J.J. refused to close the front door because he wanted to supervise the scene and make sure that R.J. was not harmed during her interaction with the officers. Officer Jenkins asked E.J.J. to close the door several times, but E.J.J. refused despite being repeatedly warned that he could be arrested for obstructing the officers. "The officers' request[s] for [E.J.J.] to go inside and shut the door were not unreasonable because his presence, yelling and refusal to comply with police escalated [R.J.]'s behavior" and his presence in the doorway presented a safety concern for the officers.

9

No. 88694-6
Madsen, C.J., concurring

CP at 15 (Finding of Fact 19-20). Because E.J.J. continued to refuse to close the front

door, he was arrested for obstruction.

After hearing testimony as above described, the trial court opined and ruled as

follows:[13]

> So here we have really two stages in what developed. The first stage had to do with [E.J.J.] going outside the house because he felt that his sister was potentially being threatened with force, and so he wanted to, as he put it, supervise the situation.
> *The evidence is quite clear that [E.J.J.] was told several times that he needed to step away*, and he finally did so, and if this case had ended at that point perhaps there would be no obstruction charges, but the situation continued and the officers finally arrested [E.J.J.] for obstruction after he continually opened the door after the officer told him he wanted the door closed.
> One of the issues that has been raised by the defense is that the officer essentially had no right to ask [E.J.J.] to close the door. He was in his house, he had a right to observe. [E.J.J.] himself testified that as a citizen he has a right to observe law enforcement, and the court certainly doesn't disagree with that.
> If [E.J.J.] had simply stood there *at the very beginning* and observed the situation and if the officers had said close the door and he had disobeyed that order, we might not be here today and there could very well not be sufficient evidence of obstruction. But *the court has to view what happened at the door in the context of what came before*, and the court isn't making a judgment about whether [E.J.J.] had a right to be upset, but the fact of the matter is that the situation escalated very quickly. [E.J.J.] was calling the police officers names and the court is willing to accept [E.J.J.'s] testimony that they might have called him names as well, but the fact of the matter is that [E.J.J.'s] presence outside escalated the situation, and *the court does accept the testimony of both officers that just by being there and raising his voice that it made the situation worse for the officers who were trying to calm down [R.J.]*.
> And so the fact that [E.J.J.] refused to close the door made the situation worse because it wasn't as if at that point he was simply standing in his house observing, which he would have every right to do, but [E.J.J.]

---

[13] I quote at length from the trial court's oral ruling because both the majority and Justice González's concurrence misconstrue the basis of the trial court's opinion.

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

was engaged in a back-and-forth with the officers. The word "taunting" came up. I don't know whether that accurately describes what went on here, but it's very clear to the court that *by raising his voice* and calling the officers names, *he was making his presence known to his sister, and the testimony was that through his presence, it made it more difficult for the officers to do their job.*

So I am finding [E.J.J.] guilty beyond a reasonable doubt of obstructing these law enforcement officers. And *I want to make it clear to [E.J.J.] that I'm not finding you guilty because you were disrespectful toward the police officers.* That's not an element of this offense. And I'm not even finding you guilty because you disobeyed the officer. That in and of itself may be a violation of another statute. The reason why I'm finding you guilty is because *through your acts you hindered or delayed or obstructed the officers in what they were trying to do outside.* And I understand what may have been going on in your mind. In your mind, you may well have thought that you were protecting your sister, but I think you would probably agree with me, if you don't agree with me now, perhaps if you think about it, you kind of lost your cool, and by losing your cool *you created a climate that was extremely adversarial and* also, as I've said a number of times now, *made it much more difficult for the officers to do what they came to do.* And so that is the basis for the court's ruling.

Report of Proceedings (RP) at 98-101 (emphasis added).

We have considered the constitutionality of the obstruction statute, or its predecessors, on several occasions. *See State v. Grant*, 89 Wn.2d 678, 575 P.2d 210 (1978); *State v. White*, 97 Wn.2d 92, 640 P.2d 1061 (1982); *State v. Williams*, 171 Wn.2d 474, 251 P.3d 87 (2011). In *Williams*, we observed that "our jurisprudential history [requires] conduct in addition to pure speech in order to establish obstruction of an officer." 171 Wn.2d at 485. We explained that such an interpretation of the statute applies a limiting construction necessary to save the statute's constitutionality. *Id.* at 486. Our treatment of the obstruction statute is in line with federal First Amendment analysis.

11

"[C]onduct mixed with speech may be regulated or prohibited." *Cox v. Louisiana*, 379

U.S. 559, 563, 85 S. Ct. 476, 13 L. Ed. 2d 487 (1965).

In *Cox*, the United States Supreme Court considered a statute that prohibited

persons from picketing or parading near a courthouse with the intent of interfering,

obstructing, or impeding the justice system. *Id.* at 560. Those challenging the statute

argued that regardless of the conduct at issue, the statute was unconstitutional because it

necessarily burdened speech by punishing picketers carrying signs or utilizing other

forms of expression. The court disagreed, holding that the conduct was "subject to

regulation even though intertwined with expression and association." *Id.* at 563. The

court made clear that the presence of speech "'cannot immunize . . . unlawful conduct

from state control.'" *Id.* at 564 (quoting *Giboney v. Empire Storage & Ice. Co.*, 336 U.S.

490, 502, 69 S. Ct. 684, 93 L. Ed. 834 (1949)).

The rule to be gleaned from these cases is twofold. First, pure speech alone

cannot be criminalized as obstructionist. *See Williams*, 171 Wn.2d at 485 (noting our

"concern that criminalizing pure speech would implicate freedom of speech."). Second,

*conduct*, whether carried out with protected speech or accomplished without expression

at all, can always form the basis for a conviction under RCW 9A.76.020(1). *See id.*

(requiring "conduct in addition to pure speech in order to establish obstruction of an

officer").

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Instead of following *Cox*,[14] the majority relies on *City of Houston v. Hill*, 482 U.S. 451, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987) to support the notion that "obstruction statutes may not be used to limit citizens' right to express verbal criticism, even abusive criticism, at police officers." Majority at 12. I do not disagree with that statement, but this case does not involve an obstruction arrest based on mere criticism of police. Furthermore, *Hill* addressed a very different statute. The ordinance at issue there in fact criminalized speech standing *alone*. *See Hill*, 482 U.S. at 461 (explaining that the ordinance "prohibits verbal interruptions of police officers."). Under the ordinance in *Hill*, a person could be convicted simply for speaking out.[15] Our obstruction statute is different. We have consistently construed RCW 9A.76.020(1) to require conduct in addition to pure speech. Further, the Court in *Hill* acknowledged that a properly tailored statute may inhibit protected speech when it is intertwined with obstructionist conduct. In construing RCW 9A.76.020(1), we have already engaged in the requisite narrow tailoring that *Hill* required, making clear that a conviction for obstruction must rest on conduct in addition to speech. *See Williams*, 171 Wn.2d at 486.

Here, the unchallenged findings and substantial evidence in the record support the trial court's conclusion that E.J.J.'s conduct, not his speech, formed the basis for the

---

[14] Similarly, Justice González's concurrence does not discuss *Cox*.

[15] The ordinance at issue in *Hill* made it "'unlawful for any person to . . . in any manner *oppose, molest, abuse or interrupt* any policeman in the execution of his duty,' and thereby prohibits verbal interruptions of police officers." *Hill*, 482 U.S. at 461 (emphasis added) (alteration in original) (quoting Code of Ordinances, City of Houston, Texas, § 34–11(a) (1984)). The Court opined that the ordinance "is not limited to fighting words nor even to obscene or opprobrious language, but prohibits speech that 'in any manner . . . interrupt[s]' an officer." *Id.* at 462 (alterations in original). The ordinance in *Hill* also had no intent element, as RCW 9A.76.020(1) does.

13

charge and conviction in this case. In accordance with *Williams*, the trial court explained that E.J.J. was being convicted not for insulting the police officers, but for hindering them in the performance of their duties. This conduct included interjecting himself into the investigation scene, knowingly agitating R.J., repeatedly refusing to leave the scene until he was escorted back to the house by an officer, and thereafter repeatedly failing to comply with officers' directives despite repeated warnings that his behavior was obstructing the officers' investigation and would result in his arrest.

Citing *Street v. New York*, 394 U.S. 576, 89 S. Ct. 1354, 22 L. Ed. 2d 572 (1969), the majority asserts that we must look past the trial court's findings and consider the record as a whole. Here, police testimony, which the trial court expressly accepted, established that, based on officer safety concerns, police instructed E.J.J. (1) to step away from the investigation scene, which he refused to do until police escorted him back to the house and (2) to close the front door, which he refused to do. RP at 42-43. This is "conduct" by any measure.

Secondly, *Street* is a case concerning "flag desecration perpetrated in the course of a political protest," 394 U.S. at 604-05 (Warren, C.J., dissenting), in violation of a New York statute that prohibited both public mutilation of an American flag and publicly casting contempt on the flag "'by words.'" *Id.* at 589 (quoting N.Y. PENAL CODE § 1425). In *Street*, the Supreme Court held:

> In the face of *an information explicitly setting forth appellant's words as an element of his alleged crime*, and of appellant's subsequent *conviction under a statute making it an offense to speak words of that sort*, we find this record insufficient to eliminate the possibility either that appellant's words

14

were the sole basis of his conviction or that appellant was convicted for
both his words and his deed.

*Id.* at 590 (emphasis added). The Supreme Court reversed defendant's conviction under circumstances where (1) defendant was charged with and convicted of violating a statute containing multiple prohibitions, including an unconstitutional prohibition against pure political speech, (2) the trial court's decision did not specify the ground on which the conviction rested, and (3) the basis of the judge's conviction decision could not otherwise be ascertained from the record. *See id.* at 585-88. E.J.J.'s case, however, does not involve a statute that prohibits speech. Nor does the charging document indicate that E.J.J.'s speech was a basis for his arrest. CP at 1. And here the trial court gave a clear articulation of the basis of its decision finding E.J.J. guilty of obstruction. *See* RP at 100-01. Indeed, the trial court's oral ruling took pains to set forth and analyze the evidence presented at trial. The court's lengthy explanation, given for the benefit of the juvenile defendant, should not be read out of context. The trial court here expressly and clearly articulated the basis for its guilty verdict: E.J.J.'s "*acts*" that hindered the officers' investigation and efforts to deal with E.J.J.'s sister outside the house. *See id.* By contrast in *Street*, the particulars of the statute at issue and the absence of clarity in the verdict, necessitated the Supreme Court's reviewing the record to try and discern the basis of the defendant's conviction. Those circumstances are not present in E.J.J.'s case.

The majority opines that E.J.J.'s "physical approach" and "mere presence" at the investigation scene does not amount to sufficient "conduct" to sustain his conviction, particularly because "nothing in the record establishes any connection between E.J.J.'s

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

speech or presence and anything that specifically resulted from it." Majority at 9-10.

But, as discussed, the record clearly establishes E.J.J.'s hindering conduct.[16]

The majority also contends that E.J.J.'s refusal to close the front door was "so intertwined" with his "protected speech" of "hurl[ing] abuses on the officers" that the majority finds "insufficient evidence of E.J.J.'s conduct to support his conviction on this basis." Majority at 10. But the presence of speech does not immunize unlawful conduct. *See Cox*, 379 U.S. at 564; *Williams*, 171 Wn.2d at 485 (requiring "conduct in addition to pure speech in order to establish obstruction of an officer").

Finally, the majority appears to hold that the presence of *any* speech creates an uncertainty that requires dismissal. That approach is contrary to *Cox*, 379 U.S. at 564, which held, "[T]he fact that free speech is intermingled with . . . conduct does not bring with it constitutional protection."[17] Here, the trial court's findings, which are based on

---

[16] The unchallenged findings spell out the connection that the majority asserts is missing. "[E.J.J.]'s yelling and repeated refusals to follow the officers' instructions to go back inside the house *caused* [R.J.]'s behavior to escalate." CP at 15 (emphasis added) (Finding of Fact 13). E.J.J.'s behavior "agitated" R.J., and he "knew that his presence was making it difficult for the officers to keep [R.J.] still and calm." *Id.* at 14 (Finding of Fact 8-9); *see also* CP at 15 (Finding of Fact 20) (E.J.J.'s "presence, yelling and refusal to comply with police escalated [R.J.]'s behavior.").

[17] The majority says *Cox* is limited to the issue presented therein, which it identifies as "a constitutional challenge to a statute that prohibited picketing near courthouses." Majority at 12 n.9. But the Supreme Court explained in *Cox* that it was applying a rule of broader application to the case at issue. "The examples are many of the application by this Court of the principle that certain forms of conduct mixed with speech may be regulated or prohibited." *Cox*, 379 U.S. at 563 (citing examples). The Supreme Court explained, "'[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *Id.* at 563 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. at 502). "We are not concerned here with such a pure form of expression as newspaper comment or a telegram by a citizen to a public official. We deal in this case not with free speech alone, but

16

No. 88694-6
Madsen, C.J., concurring

substantial evidence in the record, made clear that E.J.J. was being convicted for his conduct and not for his speech. RP at 100-01. As importantly, the trial court's findings establish that the officers had "legitimate safety concerns" based on E.J.J.'s conduct as the scene evolved. CP at 15 (Finding of Fact 19). By ignoring or discounting such findings, the majority's analysis makes officers less safe.[18] Accordingly, I cannot agree with the majority's rationale.

An Appropriate Resolution

As noted earlier, while I disagree with the majority's reasoning, I concur in the result. Obstruction statutes provide an important tool for law enforcement, when used appropriately. Rather than jeopardize the legitimate use of the obstruction statute, I would require courts to scrutinize the conduct of the officers involved in these types of charges to protect the due process rights of all the people we serve.

Dismissing my concurrence as "problematic," the majority impliedly criticizes my suggestion of adding a common law requirement to the obstruction statute. Majority at 13. But this court "may . . . take any . . . action as the merits of the case and the interest of justice may require." RAP 12.2; *see also Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 160*, 151 Wn.2d 203, 213, 87 P.3d 757 (2004) ("'[t]his

---

with expression mixed with particular conduct." *Id.* at 564. So noting, the Supreme Court held, "[T]he fact that free speech is intermingled with such conduct does not bring with it constitutional protection." *Id.* In my view, the rule applied in *Cox* is applicable in E.J.J.'s case as well.

[18] This court is not free to ignore findings that are supported by substantial evidence that includes witness testimony. *See Davis v. Dep't of Labor & Indus.*, 94 Wn.2d 119, 124, 615 P.2d 1279 (1980) ("it is not the function of an appellate court to substitute its judgment for that of the trial court or to weigh the evidence or the credibility of witnesses").

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

court has the inherent discretionary authority to reach issues not briefed by the parties if those issues are necessary for decision'" (alteration in original) (quoting *City of Seattle v. McCready*, 123 Wn.2d 260, 269, 868 P.2d 134 (1994))). We have not shied from adding reasonable limiting judicial constructions where appropriate and necessary in other circumstances. For instance, we judicially limited the reach of statutes prohibiting "threats" to apply only to "true threats" because "[t]he First Amendment prohibits the State from criminalizing communications that bear the wording of threats but which are in fact merely jokes, idle talk, or hyperbole." *State v. Schaler*, 169 Wn.2d 274, 283, 236 P.3d 858 (2010). Accordingly, in *State v. Johnston*, 156 Wn.2d 355, 364, 127 P.3d 707 (2006), we interpreted the bomb threat statute, RCW 9.61.160, to reach only "true threats" in order to save that statute from constitutional infirmity. Similarly, in *Schaler*, we construed the threats-to-kill provision of the harassment statute, RCW 9A.46.020, to apply only to "'true threats.'" 169 Wn.2d at 283-84. Again, this court has added a "nexus" requirement to save deadly weapon/firearm sentence enhancements from constitutional infirmity. *See State v. Brown*, 162 Wn.2d 422, 435, 173 P.3d 245 (2007) (adherence to judicially imposed nexus analysis harmonizes the imposition of mandatory deadly weapon/firearm sentence enhancements with the constitutional right to bear arms); *State v. Schelin*, 147 Wn.2d 562, 575, 55 P.3d 632 (2002) ("Requiring a nexus between the defendant, the crime, and the weapon protects against violation of the right to bear arms.").

18

No. 88694-6
Madsen, C.J., concurring

As for the obstruction statute at issue here, we observed in *Williams*, "Our constitution puts constraints on the State and guarantees certain protections and liberties to the people. Our continued interpretation of obstruction statutes as requiring some conduct ensures these constitutional limits are maintained." 171 Wn.2d at 486. Adding the common law requirement I propose would refine and continue the limiting judicial construction we have previously applied to the obstruction statute to maintain its constitutionality. We should not shy from that task today.

In my view, adding the new common law requirement is the only appropriate way to resolve this case and address the broader problem that this case touches on; this is why we granted review in the first place. This court clearly has the authority to so act, and the interests of justice oblige us to do so. The added requirement would serve both the community and police officers. Such revision preserves the obstruction statute as an effective tool that, when used appropriately, plays an important role in protecting officers, who daily put their lives on the line to serve and protect our community. Such revision would further the dual goals of curbing improper use of the obstruction statute and enhancing the community's perception of fairness regarding contacts with law enforcement. Such revision would play an important role, along with unbiased policing, de-escalating training, and community policing techniques, in making members of the community into partners instead of adversaries. Accordingly, I would apply the new common law requirement noted herein.

On this basis, I concur in the majority's reversal of E.J.J.'s conviction.

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 88694-6

Madsen, C.J. concurring

Madsen, C.J.

Seinfeld, J.P.T.

Wiggins, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. E.J.J.*, No. 88694-6 (González, J., concurring)

No. 88694-6

GONZÁLEZ, J. (concurring)—E.J.J. is not guilty of obstruction. Since we conclude, among other things, that the State presented insufficient evidence to sustain his conviction, our dismissal of his conviction is necessarily with prejudice. From this case, at least as a matter of law, he is free. On this point we are unanimous. I write separately to emphasize why I completely agree with the majority's analysis of E.J.J.'s free speech rights and agree, in part, with the chief justice's concurrence that the context of this case matters.

This case is about our liberty in context. On July 4, 1776, we announced our independence from Great Britain with these ringing words: "WE hold these Truths to be self-evident, that all Men[1] are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the Pursuit of Happiness." THE DECLARATION OF INDEPENDENCE para. 2. The history of this nation is the history of our efforts to keep this promise to each other, even if at times we

---

[1] Unfortunately, our founders mistakenly omitted women from their stirring statements.

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

fall short. *See generally* RICHARD KLUGER, SIMPLE JUSTICE (1975). This second sentence of our Declaration of Independence encapsulates the moral ideal to which we must strive if we are to be true to our best heritage. Abraham Lincoln believed the Declaration represented principles through which the United States Constitution should be interpreted. JAMES M. MCPHERSON, ABRAHAM LINCOLN AND THE SECOND AMERICAN REVOLUTION 126-27 (1990); 2 ABRAHAM LINCOLN, LIFE AND WORKS OF ABRAHAM LINCOLN: EARLY SPEECHES: 1832-1856, at 248-49 (1907). I agree.

E.J.J. is entitled to this Liberty. He is entitled, like everyone else in our state, to freedom of speech and equal justice before the law. WASH. CONST. art. I, § 5; *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011). We can keep our promise to him and to each other that all people are equal before the law. We must keep this promise, and we must keep it in a way that is specific enough to be meaningful.[2] Today, the court has done so by articulating a clear test when we are considering whether the obstruction statute has been constitutionally applied: that we will scrutinize the record to ensure the "conviction *could not* have been based on speech alone." Majority at 7. We do this to ensure that constitutionally protected speech is not criminalized. Henceforth, if our careful review of the record persuades us that the conviction could have been based on constitutionally protected speech alone, we will reverse.

---

[2] Atmospheric calls for equal justice have not kept this promise. Like the man said, "[j]ustice for all just ain't specific enough." JOHN LEGEND & COMMON, *Glory, on* SELMA (Columbia Records 2014).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Let me explain why I write of such lofty things in what might be called a garden variety obstruction case.

On February 14, 2011, E.J.J.'s mother called the police to assist her family in crisis. E.J.J.'s younger sister was intoxicated and breaking windows. The police responded and intervened. E.J.J., 17 years old at the time, saw one officer raise his nightstick as the police tried to subdue his sister. E.J.J. was concerned for his sister's welfare and let the police know he was watching. E.J.J. and one officer called each other names. An officer ordered E.J.J. to retreat to his house. At first E.J.J. refused, but ultimately he acceded. Once inside, E.J.J. asserted his right to watch the police from inside his own home. He refused an unlawful order to close his own door. He refused to turn away. For this, he was arrested, charged, and convicted. (If this is typical of the cases for which King County wants to build a new youth jail, perhaps the community opposition is understandable.)[3]

I started by saying this case is about Liberty in context. The real context is not subsequent events in Missouri[4] or New York.[5] The context is

---

[3] The King County Council voted 7-0 to approve a design-build contract for a new $210 million King County Children and Family Justice Center on February 9, 2015, after six hours of "community members deliver[ing] fiery public testimony accusing Council members of racism." Marcus Harrison Green, *Activists Can't Stop the Youth Detention Center. So What Now?*, SEATTLE WEEKLY, Feb. 17, 2015, *available at* http://www.seattleweekly.com/home/956961-129/activists-cant-stop-the-youth-detention (noting that "[a]ctivists cite the county's own data that reveals that as of 2012, 42 percent of the juveniles incarcerated in Washington's most populous county were black, even though blacks account for only 7.7 percent of the general population—noting that this figure is almost identical to the national average (43 percent), belying our region's claim as a bastion of progressive values").

[4] A police officer shot and killed Michael Brown, an unarmed African-American teenager, on August 9, 2014, in Ferguson, Missouri. The shooting prompted protests that roiled the area for weeks. A grand jury decided not to indict the police officer on

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

that E.J.J. is a young black man in a city where the police have been found

by the United States Department of Justice (DOJ) to use excessive force

against nonviolent black youth, especially when intoxication or mental

health issues are involved, and that the charge of obstruction is used against

black defendants disproportionately.[6] Even if the officers who responded to

E.J.J.'s family that night are unfairly painted by the DOJ's brush, E.J.J. had

cause to be concerned for his sister and a right to observe, especially from

inside his own home.

I acknowledge that E.J.J.'s behavior was, in some ways, typically

juvenile. It must have made it harder for the police officers to do their jobs;

verbally challenging officers "'operates, of course, to impair the working

efficiency of government agents.'" *City of Houston v. Hill*, 482 U.S. 451,

---

November 24, 2014. The announcement set off another wave of protests. *See* Jack Healy, *Ferguson, Still Tense, Grows Calmer*, N.Y. TIMES (Nov. 26, 2014), *available at* http://www.nytimes.com/2014/11/27/us/michael-brown-darren-wilson-ferguson-protests.html?_r=0.

[5] Eric Garner, an unarmed African-American man, choked to death when a police officer used a chokehold on him and compressed his chest on July 18, 2014, in New York City. Just over a week after the grand jury's announcement in the Michael Brown case, on December 3, 2014, a grand jury determined not to indict the police offer in relation to the death of Eric Garner, triggering a wave of protests. *See* J. David Goodman & Al Baker, *Wave of Protests after Grand Jury Doesn't Indict Officer in Eric Garner Chokehold Case*, N.Y. TIMES (Dec. 3, 2014), *available at* http://www.nytimes.com/2014/12/04/nyregion/grand-jury-said-to-bring-no-charges-in-staten-island-chokehold-death-of-eric-garner.html.

[6] In its exhaustive investigation of the Seattle Police Department (SPD), the DOJ found that "among the 76 'obstruction only' charges [filed in 2008], 51% involved Black individuals." U.S. Dep't of Justice Civil Rights Div., Investigation of the Seattle Police Department 28 (2011), *available at* http://www.justice.gov/crt/about/spl/documents/spd_findletter_12-16-11.pdf. Though this alone should be cause for grave concern given that African Americans make up about 7 percent of Seattle's population, it is especially alarming when coupled with the fact that more than half of all incidents involving excessive or unreasonable uses of force by the SPD involved nonwhite subjects. *Id.*

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

464 n.12, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987) (quoting Note, *Types of Activity Encompassed by the Offense of Obstructing a Police Officer*, 108 U. PA. L. REV. 388, 407 (1960)). But free speech often "demands some sacrifice of efficiency." *Id.* We should not criminalize and pathologize typical juvenile behavior.

E.J.J.'s speech was clothed in constitutional protection, just as police officers are clothed with the authority of law. I am intrigued by the new common law requirement proposed by the chief justice, and I agree with her that we should consider officers' conduct in context when determining whether there is sufficient evidence to sustain a conviction. Concurrence (Madsen, C.J.) at 6. By assuming the authority of the law, police also take on the burden of restraint in its use. As the inimitable Judge Kozinski observed, "[W]hile police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th. Cir. 1990). Both our state and federal Bill of Rights strongly protect E.J.J.'s right to observe and criticize the police. *Id.*; *State v. Williams*, 171 Wn.2d 474, 484-86, 251 P.3d 877 (2011). Our obstruction statutes must be narrowly construed to conform to these constitutional free speech protections. *Williams*, 171 Wn.2d at 486; *State v. White*, 97 Wn.2d 92, 97, 640 P.2d 1061 (1982). Simply put, "in order to find obstruction statutes constitutional, appellate courts of this state have long required conduct." 171 Wn.2d at 485 (citing *State v. Bobic*, 140 Wn.2d

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

250, 264, 996 P.2d 610 (2000)). As the American Civil Liberties Union of Washington rightly points out, E.J.J. was not punished for his conduct. E.J.J. was punished because he was watching and speaking when the police did not want him to. The trial court's oral ruling makes this abundantly clear:

> [J]ust by being there and raising his voice [E.J.J.] made the situation worse for the officers who were trying to calm down [his sister].
>
> And so the fact that he refused to close the door made the situation worse because it wasn't as if at that point [E.J.J.] was simply standing in his house observing, which he would have every right to do, but [E.J.J.] was engaged in a [verbal] back-and-forth with the officers. The word "taunting" came up. I don't know whether that accurately describes what went on here, but it's very clear to the court that by raising his voice and calling the officers names, he was making his presence known to his sister, and the testimony was that through his presence, it made it more difficult for the officers to do their job.
>
> So I am finding [E.J.J.] guilty beyond a reasonable doubt of obstructing these law enforcement officers.

Report of Proceedings at 100. E.J.J. was not arrested and convicted for any of his own conduct. He was arrested and convicted for his speech and his refusal to shut his door and turn away.

E.J.J.'s conviction was not just, and it is not lawful. If the obstruction charge can be used this way, it violates the Liberty we hold so dear. We reverse not despite E.J.J.'s actual obstruction of the officers but because his conduct was not criminal. Instead, his Liberty to look at and speak to the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

police is protected by our constitutions, even if he acted like the juvenile he was at the time.

With these observations, I fully concur in the majority.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. E.J.J.*, No. 88694-6 (González, J. concurring)

González, J.